THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:19-cr-85

ZAHIDA AMAN, et al.,
             Defendants.

## **OPINION**

On May 13, 2022, after a two-week trial, a jury convicted Zahida Aman of conspiracy, forced labor, and document servitude; Mohammad Nauman Chaudhri of conspiracy; and Mohammed Rehan Chaudhri of conspiracy and forced labor. These convictions arise from a three-count superseding indictment, which charged the defendants—Aman and two of her sons, Nauman Chaudhri and Rehan Chaudhri—with conspiring to obtain and maintain the unpaid labor and services of M.B. between March 2002 and August 2014, forced labor, and document servitude.

All three defendants now move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (ECF Nos. 245, 246, 248.) The defendants argue that (1) the forced labor statute—the Trafficking Victims Protection Act—does not apply to a domestic relations case such as this one and therefore any convictions for forced labor or conspiring to force labor cannot stand; and (2) sufficient evidence does not support their convictions. Aman and Nauman Chaudhri also move for a new trial pursuant to Federal Rule of Criminal Procedure 33, arguing that M.B.'s trial testimony was incredible and repeatedly impeached. (ECF Nos. 245, 248.)

The government asks the Court to deny the defendants' motions because it properly prosecuted the defendants under the forced labor statute; sufficient evidence supports the convictions returned by the jury; and M.B. offered credible testimony. The Court agrees that the forced labor statute reaches the defendants' conduct; that sufficient evidence supports the

defendants' convictions; and that M.B. testified credibly such that allowing the defendants' convictions to stand does not result in manifest injustice. The Court will, therefore, deny the defendants' motions.

## I. **PROCEDURAL BACKGROUND**

On August 7, 2019, a grand jury returned a three-count superseding indictment, charging the defendants with conspiracy (Count One), forced labor (Count Two), and document servitude (Count Three). (ECF No. 38.)

The government accused the defendants of conspiring to obtain and maintain the unpaid labor and services of M.B. between March 2002 and August 2014. During this time, M.B. was married to M.S.C., another son of Aman. The government contended that in order to force M.B. to do work for them at their home, the defendants physically abused M.B. and her children and used threats related to M.B.'s immigration papers.

After numerous delays due to the COVID-19 pandemic and attorney conflict of interest, the defendants' trial commenced in May 2022 and lasted two weeks. A jury found Aman guilty of Counts One through Three; Nauman Chaudhri guilty of Count One and not guilty on Counts Two and Three; and Rehan Chaudhri guilty of Counts One and Two and not guilty on Count Three. (ECF No. 225.)

## II. **EVIDENCE PRESENTED AT TRIAL**[1]

In 2001, M.B.'s mother and Aman arranged for M.B. to marry M.S.C., one of Aman's sons. (Tr. 402, 405.) By 2001, M.B. had reached an age where she, as a Pakistani woman, felt pressure to marry. (Tr. 405.) M.B. also felt pressure to make the marriage work because this

---

[1] The Court construes this evidence in the light most favorable to the government pursuant to the standard by which a court reviews a Rule 29 motion for a judgment of acquittal. *See infra* Section III.A.1.

arrangement was the first major decision M.B.'s mother had made since becoming a widow. (Tr. 402–03, 410–11.)

In January 2002 in Pakistan, M.B. married M.S.C. under Islamic law. (Tr. 412.) Contrary to common practice in Pakistan, M.B. met M.S.C. for the first time on their wedding day. (Tr. 408–09.) During their first night together as husband and wife, M.S.C. told M.B. that "if his family, especially his mom, Zahida Aman, is happy with [her], he's going to put [her] on a pedestal and [their] relationship w[ould] be good." (Tr. 425.)

The day after the wedding, Aman and other members of the Chaudhri family took M.B. to the embassy in Pakistan for a marriage visa. (Tr. 416–17.) After receiving the visa, M.B. boarded a plane for the first time ever and flew to Washington, D.C., with M.S.C. (Tr. 426–27.) Rehan Chaudhri and Nauman Chaudhri met M.B. and M.S.C. at the airport in Washington and drove them to the family home in Midlothian, Virginia, where M.B. and M.S.C. would live. (Tr. 427–28.) The defendants (and Aman's elderly husband, S.C.) also lived at the same home.

The day after arriving, Aman sat M.B. down and told her, "[Y]ou are the daughter-in-law of a retired general colonel and the wife of a doctor here in the United States, so you need to put your standards up. And if you want to be happy in your married life, the way to your husband's heart is through me. . . . And if you want him happy, you have to make me happy."[2] (Tr. 429.) Shortly thereafter, Aman began to regularly instruct M.B. to perform work in the house. (Tr. 429–30.)

During the early years of M.B.'s time at the Chaudhri house, her work included "clean[ing] the living room, the kitchen, the laundry room and the downstairs half bathroom before [any other members of the family came] downstairs" each morning, cleaning the deck if Aman wanted to take

---

[2] Aman's husband served as a general colonel in Pakistan. M.S.C. is a physician.

3

her tea or breakfast outside, sometimes preparing breakfast for the Chaudhri family, prepping for lunch and dinner, and cleaning dirty dishes. (Tr. 429–30.) M.B. "basically clean[ed] all day . . . until [she went] to bed." (Tr. 430.) M.B. was initially willing to perform this work to make the Chaudhri family happy and, hopefully, win the affection of Aman and in turn, her husband. (Tr. 431.)

M.B. lived at the Chaudhri house from 2002 to 2016. During this time, she had four children, born in 2003, 2004, 2006, and 2008, respectively. (Tr. 468–69.) Her husband visited there periodically but spent the majority of his time living elsewhere and working as a doctor— first in Washington, D.C., then in Philadelphia, and then in California. (Tr. 448–51.)

When M.B. traveled to the United States, she had with her jewelry and paperwork, including immigration documents, education documents, and a passport. Immediately upon M.B.'s arrival, Aman took her jewelry. (Tr. 431–32.) As for the paperwork, M.B. testified that shortly after M.B. came to the Chaudhri house, Aman asked for her documents, including her immigration documents and passport. (Tr. 433.) M.B. refused Aman's request. (*Id.*) Then Aman, S.C., and M.S.C. gathered in Aman and S.C.'s bedroom and asked M.B. to enter. (Tr. 433–34.) M.S.C. told M.B., "My father keeps all the passports, and everything, in the safe. You cannot keep them. You have to give it to them." (Tr. 434.) Again, M.B. tried to refuse, but M.S.C. "enforced that [she] should" agree, so according to M.B., "she had no choice except to go and bring [the documents]." (*Id.*) Aman did not take from M.B. the $200 or $300 that M.B.'s mother gave her to take to the United States. (Tr. 426.) Aman did not know about this money because after Aman denied M.B. permission to bring the money to the United States, M.B. hid the money in her bra during the trip. (*Id.*)

4

After M.B. handed over the documents, the defendants placed M.B. under the impression that she remained in the United States illegally. (Tr. 436.) Shortly after arriving to the United States, M.B.'s green card came in the mail, but it spelled her name incorrectly. (Tr. 435–36.) Because M.B. never saw a corrected green card, as far as she knew, she remained illegally in the United States. (Tr. 436.) M.B., therefore, believed the defendants when they told her she lacked legal immigration status in the United States. Indeed, throughout the twelve years that M.B. lived at the Chaudhri house in Midlothian, the defendants repeatedly told M.B., "We can deport you. Your paperwork is incomplete." (Tr. 438.) M.B. also testified that every time she would retaliate or refuse to abide by any instructions from the defendants—about twice a month—the defendants would tell her to "calm [her]self down because [she could] be deported." (Tr. 438.) Each of the defendants made clear to M.B. that upon her deportation, they would keep her children. (Tr. 439–40.)

M.B. caught a glimpse of her identification just one time while there—during a trip with the Chaudhri family to California. (Tr. 496.) M.B. testified that Aman held her identification during the trip, Aman handed M.B.'s identification to airport security personnel, and Aman intervened when airport security personnel attempted to hand M.B.'s identification to M.B. (Tr. 495.)

The defendants used more than the confiscation of M.B.'s immigration papers to isolate M.B. Shortly after M.B. arrived in the United States, Aman took M.B.'s diary, which contained the contact information for M.B.'s friends and family. (Tr. 459–61.) Starting during M.B.'s first days in the United States, Aman would stand by M.B. when M.B. used the family's phone. Around 2006, Aman forbade M.B. from using the phone entirely. (Tr. 459–61, 774.) Without a cell phone, private access to the family phone, or a computer, M.B. did not have any means of private

communication with her family in Pakistan.  During her years at the Midlothian house, M.B. lost touch with her family to such an extent that until her brother reunited with M.B. in 2015, M.B.'s family did not know if she was alive or dead.  (Tr. 200–01.)

The only money M.B. had during her time with the defendants was the money that M.B.'s mother encouraged her to take to the United States in 2003, (Tr. 426, 574), and money that M.B.'s brother gave to her in 2015, (Tr. 223).  M.B. did not have a driver's license.  Indeed, at an event at a local mosque, Rehan Chaudhri followed M.B. and forced her to tell one of her children's teacher's, who had just encouraged M.B. to get her driver's license so she could make friends, that she had no interest in learning to drive.  (Tr. 464–65.)  The defendants also forbade M.B. from talking to her neighbors.  (Tr. 461.)  M.B. did manage to leave the house on her own multiple times—for exercise and for a long walk to stores, (Tr. 522, 1203)—but without a car, money, phone, or, to her knowledge, legal status, M.B. chose to remain there with her children.

Eventually, the defendants even restricted M.B.'s access to food.  (Tr. 508, 556–57.)  The defendants kept locked away the food that remained downstairs, (Tr. 554), and moved much of the food to Aman's room upstairs, which Aman kept locked, (Tr. 556).  Aman gave M.B. food to eat but did not allow her access to the family's food.  M.B. would eat her meals after the rest of the family had finished eating.  (Tr. 556–57.)

M.B.'s living conditions also worsened through the years.  When M.B. first moved into the house, she shared a bedroom with M.S.C.  (Tr. 553.)  After she began having children, she moved into the children's room; after the birth of her fourth child in 2008, she began sleeping on the floor of the children's room.  (*Id.*)  Several years after the birth of her fourth child, the defendants moved M.B. into the laundry room; M.B. slept on a mat on the laundry room floor.  (Tr. 553–54; 558.)  The defendants later converted their garage into a finished annex, which included two rooms, a

6

kitchenette, and a bathroom. (Tr. 568; Def. Ex. 58-A.) After a couple years of living in the laundry room, the defendants moved M.B. into this annex, which had a door that opened onto the back deck and a door connected to the main house. (Tr. 568–69.) The defendants kept the door connecting the annex and the main house locked and gave M.B. one or two weeks of microwavable food at a time. (Tr. 569.)

The defendants also caused M.B.'s children to fear their mother by telling them that M.B. was "a crazy woman" who would "sell them out for money." (Tr. 519–20.) The defendants told the children not to go near M.B. or she would hurt them. (Tr. 519–20.) Nauman Chaudhri and Aman yelled at M.B.'s youngest child and punished him for talking to M.B. (Tr. 516–18.) M.B.'s second child, K.S.C., testified that when the defendants told her these things about her mother, she believed them; "I didn't know my mother. I didn't know if she was actually crazy. All I know is what the people I lived with were telling me, and I believed them." (Tr. 957.) K.S.C. explained that although she never saw her mother do anything violent, K.S.C. "ended up becoming very scared of her [mother], didn't want to talk to her, didn't want to be near her because" based on what the defendants told K.S.C., "it seemed like [her mother] was someone capable of hurting [her]." (Id.)

The housework the defendants instructed her to perform intensified from cooking, cleaning, and laundry. Although Aman primarily instructed M.B.'s work, everyone in the home, including Nauman Chaudhri and Rehan Chaurdhi, instructed M.B. to perform housework and other tasks like "painting the house" both inside and outside as far as she could reach from the ground, "rip[ping] apart carpets," washing rugs, "clean[ing] cars," mowing the grass, moving furniture, trimming trees, cleaning and staining the deck, and laying a concrete walkway. (Tr. 496–505.) Although the Chaudhri household had laundry machines, Aman forbade M.B. from using the

7

machines and required her to clean the laundry by hand in the sink. (Tr. 498–99.) After moving M.B. into the laundry room several years after 2008, the defendants gradually stopped asking M.B. to perform work.

When M.B. first arrived, she performed the housework willingly to curry favor with her new in-laws. But in 2002, the defendants began to verbally abuse M.B., calling her "whore, good for nothing, bastard, bitch" if M.B. completed "a chore, or anything in the house . . . not . . . according to their liking." (Tr. 441–42.) In 2003, the defendants began to physically abuse M.B. The first violent episode occurred after a sleepless night taking care of her oldest daughter when she was an infant. (Tr. 453–54.) M.B. came downstairs to start her morning chores later than Aman had directed. (Tr. 453.) Aman was angry with M.B. and "cussed [her] out." (*Id.*) M.B. apologized for her tardiness and explained that she would "finish everything that [Aman had] asked [her to do]." (*Id.*) This made Aman more upset, and Aman slapped M.B., leaving a mark on M.B.'s face with her nail. (*Id.*) From this incident, M.B. learned that she "had no say in [her work]. [She] had to do it." (Tr. 458.)

M.B. testified that each of the defendants slapped her "[i]f [she hadn't] listened to them, if their mom is angry, . . . if [she] didn't do a chore right. Like, anything that could just make them upset with [her] when [she] would tell them [she would] finish it or something. Anything." (Tr. 456.) The defendants also involved the children in their abuse of M.B., instructing the children to slap M.B. (Tr. 513–14; 1086–88.) This physical abuse lasted for the duration of M.B.'s years at the Chaudhri house. (*See, e.g.*, Tr. 458.) Although the defendants regularly abused M.B., particular incidents stand out.

### A. Washington, D.C. Incident

M.B. testified that during a trip within a couple years after 2004, the year M.B.'s second child was born, the family took a daytrip to Washington, D.C. (Tr. 482–83.) During this visit, the defendants left M.B. on the side of the road for misplacing her child's shoe; after M.B. ran after the car, which also held her children, the defendants stopped the car and asked M.B. to get in. (Tr. 483–84.)

### B. The Knife Incident

During another incident, Aman's daughter, B.A., and Aman started verbally abusing M.B. "for not doing a chore" or because "the kids were making noise." (Tr. 506.) B.A., holding a knife, told M.B. that she would cut her throat if she did not shut up. (Tr. 506.) B.A. then held a knife to M.B.'s throat in front of Aman and M.B.'s oldest child. (Tr. 506–07.) M.B.'s oldest child, born in 2003, testified that her "head was just a little bit over the doorknob" when she witnessed B.A. hold a knife to M.B.'s throat while Aman accused M.B. of lying. (Tr. 1083–84.)

### C. The Stairs Incident

One day after mowing the lawn—work M.B. stopped performing several years after 2008—M.B. came into the house and asked for a glass of water. (Tr. 507–08.) Aman denied M.B.'s request. M.B. then opened the refrigerator to find something to eat. Aman told M.B. "to close the fridge door and start doing the other chores, there were dishes to be washed and the kitchen to be cleaned." (Tr. 508.) Aman and M.B. started yelling at each other. M.B. then grabbed Rehan Chaudhri's phone and ran upstairs, hoping to call M.S.C. (Tr. 509.) Rehan Chaudhri ran after M.B., took his phone back, and kicked M.B. in the stomach. (Tr. 509.)

Two weeks after this incident, Rehan Chaudhri and B.A. approached M.B. to "deal[]" with what M.B. had done. (Tr. 510.) B.A. and Rehan Chaudhri, joined by Aman, tied M.B. up with a rope and dragged and pushed her down the stairs. (Tr. 511, 966, 1085.)

### D. The Car Incident

After a fight at the house, M.B ran a couple blocks away. (Tr. 544.) Nauman Chaudhri and Aman drove after her. (*Id.*) After spotting M.B. in a bush, Nauman Chaudhri and Aman tied her up in a scarf, "shoved" and "dragged" M.B. into the car despite her protesting physically and verbally, and drove M.B. back to the house. (Tr. 544–45.) M.B. never tried to run away again. (Tr. 546.)

### E. The 2x4 Incident

After the defendants moved M.B. into the laundry room and before they moved her into the annex, Rehan Chaudhri hit M.B. multiple times with a 2-inch by 4-inch piece of wood ("2x4"). (Tr. 559.) M.B. testified that after she defied Rehan Chaudhri's instruction to step into the garage while he watched TV downstairs, Rehan Chaudhri hit her six times with a 2x4—on the legs, back, and shoulder[3]—then put her in the garage, locking her out of the house. While in the garage, M.B. she cried and "took a deep breath." (Tr. 562.)

From the garage, M.B. saw contractors doing yard work. She waited for them to come near the door, at which point she left the garage and asked to borrow the contractor's phone. (Tr. 562.) M.B. hoped to call M.S.C. (Tr. 563.) But Rehan Chaudhri appeared and took the phone from M.B., returned it to the contractor, and pushed M.B. back to the garage. (Tr. 563–64.)

---

[3] In her journal and in her 2017 interview with investigators, M.B. recounted that the 2x4 struck her on the legs, back, and arm. (Tr. 703–06.) During a November 29, 2016 deposition, M.B. testified that that "the sixth time [Rehan Chaudhri] almost hit [her] head, but [she] ducked enough so it hit [her] in the head but not too much." (Tr. 706.)

Later that same day, M.B. went to the home of the Chaudhri's neighbors, Mr. and Ms. Roarty. She asked Ms. Roarty to borrow her phone. (Tr. 565.) With Ms. Roarty's phone, M.B. called M.S.C. and told him about the incident. (Tr. 566.)

*       *       *

Although M.B.'s testimony was central to the government's case, the government also offered witnesses[4] who and non-testimonial evidence[5] that corroborated much of M.B.'s testimony.

## III. DISCUSSION

All three defendants move for a judgment of acquittal pursuant to Rule 29. (ECF Nos. 245, 246, 248.) The defendants argue that (1) the forced labor statute does not apply to a domestic relations case such as this one and therefore any convictions for forced labor or conspiring to force labor cannot stand; and (2) sufficient evidence does not support their convictions. The government asks the Court to deny the defendants' motions for a judgment of acquittal because it properly prosecuted the defendants under the forced labor statute and because sufficient evidence supports the convictions returned by the jury. Because the Court finds that the forced labor statute prohibits the defendants' conduct and sufficient evidence supports each of the defendants' convictions, the Court will deny the defendants' motions for a judgment of acquittal.

Aman and Nauman Chaudhri also move for a new trial pursuant to Rule 33, arguing that M.B.'s trial testimony was incredible and repeatedly impeached. (ECF Nos. 245, 248.) The

---

[4] M.B.'s children, (*see* Tr. 954–58, 959, 961–63, 966–67, 984–87, 989–90, 1074–75, 1077, 1078–85, 1081–85, 1087–89), her brother, (*see* Tr. 197–99, 200–01, 207, 214–215), Forensic Investigator Melanie Griffiths, (*see* Tr. 324), Chesterfield County Detective Laura Kay, (*see* Tr. 361–62), Chesterfield County Police Office Matthew Wheeler, (*see* Tr. 295–96, 298), Dr. Christine Isaacs, (*see* Tr. 793–97, 814), and Barbara Flinn, (*see* Tr. 825–28)

[5] *See, e.g.,* Gov't Exhibits 3A, 3B, 8, 30, 31.

government asks that the Court deny the motions for a new trial because M.B. offered credible testimony. Because the Court finds that M.B. testified credibly such that allowing the defendants' convictions to stand does not result in manifest injustice, the Court will deny Aman's and Nauman Chaudhri's motions for a new trial.

### A. *The Defendants' Motions for Judgment of Acquittal*

#### 1. *Legal Standard*

Federal Rule of Criminal Procedure 29(c)(2) explains that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." "Where . . . a motion for judgment of acquittal is based on insufficiency of the evidence, the conviction must be sustained if the evidence, when viewed in the light most favorable to the Government, is sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998), *overruled on other grounds as recognized in United States v. Strassini*, 59 F. App'x 550 (4th Cir. 2003). Courts "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). "Importantly, the Court does not assess the credibility of witnesses and resolves direct contradictions in testimony in the government's favor." *United States v. Jama*, 217 F. Supp. 3d 882, 895 (E.D. Va. 2016).

#### 2. *Improper Application of the Forced Labor Statute, 18 U.S.C. §§ 1581–94*

The defendants argue that the government improperly prosecuted this case under the forced labor statute. They contend that the forced labor statute does not apply to familial situations like

this one and that domestic services provided by a family member do not amount to "labor or services" under the statute.

Congress passed the forced labor statute

"to implement the Thirteenth Amendment against slavery or involuntary servitude." *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014). "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion," as well as through "physical or legal coercion." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (internal quotation marks omitted); *see also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion.").

*Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *cert. denied* 138 S. Ct. 448 (2017); *see also* Pub. L. No. 106-386, § 102, 114 Stat. 1464, 1466–69 (2000).[6] "Historically, criminal prosecutions for forced labor . . . have nearly always involved employment situations and/or sexual exploitation between unrelated parties."[7] (ECF No. 245, at 11.) The defendants argue that "[t]here is no federal case where family members have been prosecuted under 18 U.S.C. § 1589 for their treatment of an in-law, or for asking an in-law to contribute to household chores." (*Id.*)

Regarding the defendants' argument that the forced labor statute does not permit the prosecution of family members in the course of a shared living arrangement, the forced labor

---

[6] The forced labor statute creates the crime of forced labor and offers trafficking victims an avenue to pursue civil remedies. *See* 18 U.S.C. §§ 1589, 1595.

[7] *See, e.g., Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) (affirming the district court's judgment in favor of the plaintiff, who suffered sexual abuse as a housekeeper for the defendants); *United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009) (affirming convictions under the forced labor statute for defendants who recruited individuals from the Philippines to work for them in the United States and then isolated these workers and compelled their continued work by threatening physical force and arrest); *United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008) (affirming conviction under the forced labor statute for defendant who induced a fourteen-year old to move from Nigeria to the United States based on the promise of education and money, but instead compelled her work through physical, emotional, and sexual abuse).

statute contains no language that suggests Congress did not intend for the statute to apply to familial situations like this one. *See* 18 U.S.C. § 1589 (2000) (barring the use of a prohibited means to compel labor or services of a "person"); *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015) (noting that "Congress imposed limitations on the . . . category of victims" in a sex trafficking statute, but did not limit the forced labor statute's "application to immigrant victims or sex workers," suggesting that "the unqualified term 'a person' is purposefully broad"), *cert. denied Hunt v. United States*, 577 U.S. 1227. "Absent ambiguity in the statutory text, '[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the statutory] language.'" *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010) (alterations in original) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)). The defendants offer no evidence that Congress did not intend the forced labor statute to apply to familial situations like this one. The Court recognizes the novelty of this case, but, in many ways, this situation is precisely what the forced labor statute seeks to reach. *See Toviave*, 761 F.3d at 629 ("Most [forced labor cases arising in the household context] involve defendants that subjected their victims to more extreme isolation . . . ."); *Calimlim*, 538 F.3d at 709 (affirming forced labor convictions of the defendant who confiscated the victim's travel documents and used threats related to her immigration status to compel her to continue); *United States v. Sabhnani*, 599 F.3d 215, 225–28 (2d Cir. 2010) (affirming forced labor conviction of the defendant who physically abused the victim, prevented her possession of her passport, and subjected her to intolerable living conditions). The Court, therefore, finds that the government properly prosecuted the defendants pursuant to the forced labor statute.

The Court also dismisses the defendants' argument that "labor or services" under the statute are limited to work provided in an employment setting. The defendants contend that household

chores that family members routinely perform in the home do not amount to "labor or services" under the forced labor statute. Not only has Congress declined to exempt household chores from "labor or services," but courts have defined "labor or services" under the forced labor statute broadly, just as this Court did to the jury: "work or the performance of any particular task of set of tasks, [including] any form of physical or mental effort or exertion to perform such work or tasks." (ECF No. 223, Jury Instruction No. 28, at 31); *see, e.g., United States v. Kaufman*, 546 F.3d 1242, 1260–63 (10th Cir. 2008) (finding no plain error with a jury instruction defining labor as "the expenditure of physical or mental effort"). Indeed, the defendants in *Callahan* forced the victim "to clean the apartment, do yardwork, care for their dogs, and run various errands for them." 801 F.3d at 614. The Sixth Circuit affirmed the district court's denial of the defendants' motions to acquit and for a new trial, thereby affirming the defendants' conviction under the forced labor statute based on the provision of these household chores. *Id.* at 621. This Court, therefore, finds that the "labor or services" under the forced labor statute can include household chores.

The defendants also point to three cases that they say most closely resemble this one: *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017) (affirming the district court's granting of summary judgment in favor of the defendants); *Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012) (same); and *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) (reversing the defendant's forced labor conviction due to insufficient evidence). In each of these cases, the civil suit or criminal prosecutions under the forced labor statute failed. For the reasons set forth below, this Court finds these three cases distinguishable from the case at bar.

In *Muchira*, the Fourth Circuit affirmed the district court's decision to grant summary judgment to the defendants, a family from Saudi Arabia who employed as a housemaid the plaintiff, Winfred Muchira, a woman from Kenya. 850 F.3d at 608–15. Muchira's employers

subjected her to strict house rules, demanding hours, and verbal reprimands; she suffered "depression, stress, and other psychological maladies" as a result. *Id.* at 622. The Fourth Circuit rejected Muchira's claim under the forced labor statute, finding that she "ha[d] failed to present sufficient evidence that the Saudi family knowingly coerced her into providing her labor and services 'by means of the abuse or threatened abuse of law or legal process.'" *Id.* at 624 (quoting 18 U.S.C. § 1589(a)(3)). The Fourth Circuit reached this conclusion even though the defendants "kept her passport, just as they had done in Saudi Arabia, in accordance with the cultural practices of their country." *Id.* at 623. The Fourth Circuit noted that Muchira "never asked to maintain possession of her passport and she was never told that she could not." *Id.* The Fourth Circuit noted that "the forced labor provisions of the [Trafficking Victims Protection Act] are not intended to . . . punish immigrants for adhering to cultural rules and restrictions that many in this country would refuse to abide by." *Id.* at 625.

Although the situations M.B. and Muchira faced bear some resemblance, the Court finds several key distinctions between them. While Muchira received a small salary for her work and had a bank account in her own name, M.B. did not receive any payment during her time with the defendants nor did she have access to a bank account in her own name. Indeed, the only money M.B. had during her time with the defendants was money that M.B.'s mother encouraged M.B. to take with her to the United States in 2003 and money that M.B.'s brother gave to her in 2015. In addition, unlike Muchira, who had her own cell phone with Internet access by which she communicated with family and friends in Kenya, M.B. did not have any means of private communication with her family in Pakistan. And unlike Muchira, who did not face abuse and lived comfortably in her own bedroom, M.B. suffered verbal and physical abuse from the defendants, had limited access to food in the defendants' home, and eventually slept on the floor

16

of the laundry room and lived alone in the annex. Finally, unlike Muchira, who never tried to keep her passport, M.B. tried to keep possession of her immigration documents but the defendants did not allow her to do so. Thus, although Muchira's forced labor lawsuit failed for lack of sufficient evidence, the government's prosecution of the defendants in this case does not suffer the same frailty.

The defendants also cite *Headley v. Church of Scientology International* to support their argument that the forced labor statute does not apply in a case like this one. 687 F.3d at 1178–81. In *Headley*, two former ministers of the Sea Org within the Church of Scientology sued the Church under the forced labor statute. They claimed that the Church "psychologically coerced them to provide labor. . . . by causing them to believe that they could not leave the ministry or that they would face serious harm in doing so." *Id.* at 1178. The Ninth Circuit affirmed the district court's decision to grant summary judgment to the defendants on the forced labor claim because the plaintiffs "joined and voluntarily worked for the Sea Org"; because they had "innumerable opportunities to leave the defendants" and "had access to vehicles, phones, and the Internet"; and because the only adverse consequence the plaintiffs "could have faced, had they taken any of their many opportunities . . . to leave the Sea Org, was to have been declared 'suppressive persons'" by the Church and "that consequence is not 'serious harm'" under the forced labor statute. *Id.* at 1180.

Just as the plaintiffs in *Headley* joined the Sea Org voluntarily, M.B. chose to marry into the Chaudhri family and travel to the United States. But unlike the plaintiffs in *Headley*, M.B. lacked access to vehicles, phones, and the Internet. Although she did manage to leave the Chaudhri house multiple times, a sudden escape would have left her in the United States without any friends and family, without money, without legal status as far as she knew, and without her children. And

17

the one instance where M.B. tried to run away, Aman and Nauman Chaudhri went after her and forcibly brought her back to the house. Further, although the plaintiffs in *Headley* suffered "isolated instances of physical force" in the Church, M.B. endured numerous incidents of physical and verbal abuse by the defendants. *Id.* at 1178. Thus, the defendants' comparison between *Headley* and this case falls short.

Finally, the defendants cite *United States v. Toviave*, in which the Sixth Circuit reversed the defendant's conviction for forced labor. 761 F.3d at 630. In *Toviave*, the defendant brought four young relatives from Togo to live with him in the United States. He made the children complete household chores, like cooking, cleaning, and doing the laundry. He also abused the children, hitting them as punishment for "minor oversights or violations of seemingly arbitrary rules." *Id.* at 624. "Although Toviave's treatment of the children was reprehensible," the Sixth Circuit found it did not amount to forced labor in violation of the forced labor statute because

> First, forcing children to do household chores cannot be forced labor without reading the statute as making most responsible American parents and guardians into federal criminals. Second, requiring a child to perform those same chores by means of child abuse does not change the nature of the work. And third, if it did, the forced labor statute would federalize the traditionally state-regulated area of child abuse.

*Id.* at 625. "[W]ithout a clear expression of Congressional intent," the Sixth Circuit explained that it should not "transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime." *Id.* at 629.

The defendants here argue that like in *Toviave*, M.B.'s labor amounted only to household chores, and just as a parental figure may compel their children to perform chores around the house, a family may expect one of its members to contribute to the household in many of the ways M.B. did. But the instant case does not place at issue a parent's right to make minor children perform

chores as did *Toviave*. Further, "[t]he line between required chores and forced labor may be a fine one in some circumstances," and although the facts of *Toviave* fell "on the chores side of the line," the facts of the instant case fall on the forced labor side of the line because of the sort of labor the defendants told M.B. to perform, the frequency with which they provided these instructions, and the manner by which they compelled M.B.'s labor. *Id.* at 630.

For these reasons, the Court will deny the defendants' judgment for acquittal based on improper application of the forced labor statute.

### 3.  *Insufficient Evidence*

In the alternative, the defendants argue that the evidence, even when viewed in the light most favorable to the government, does not support their convictions. The Court will consider this argument as to each count.

### a. Conspiracy (Count One)

As the Court explained to the jury, to establish a criminal conspiracy to commit forced labor, the government had to prove (1) that two or more people entered into an agreement or understanding to commit a crime—in this case, forced labor; (2) that at some time during the existence or life of the agreement or understanding, the defendant knew the purpose of the agreement or understanding; (3) that, knowing the purpose of the agreement or understanding, the defendant entered or deliberately joined the agreement or understanding; and (4) that at some time during the existence or life of the agreement or understanding, any one of its alleged members knowingly performed an overt act to further or advance the purpose of the agreement or understanding. *See* 18 U.S.C. §§ 371, 1589, and 2; *United States v. Singh*, 518 F.3d 236, 252 (4th Cir. 2008); *United States v. Nnaji*, 447 F. App'x 558, 559–60 (5th Cir. 2011) (upholding

19

convictions for forced labor, conspiracy to commit forced labor, and harboring an alien for financial gain).[8]

The jury returned guilty verdicts for each of the defendants as to the charge of conspiracy to commit forced labor. The defendants contend that insufficient evidence supports their convictions for conspiracy. Specifically, the defendants argue that the jury's only evidence of an agreement or understanding to commit forced labor is the familial relationship between them. Nauman Chaudhri and Rehan Chaudhri also contend that the jury lacked evidence that either of them instructed M.B. to perform housework.

### i. Agreement or Understanding to Commit a Crime

The government presented evidence beyond the defendants' familial relationship to support the existence of the conspiracy. Specifically, according to M.B.'s testimony, each of the defendants threatened her with deportation due to incomplete paperwork if she retaliated or refused to do as they said. Each the defendants made clear to M.B. that upon deportation, they would keep her children. Although Aman primarily instructed M.B.'s work, everyone in the home, including Nauman Chaudhri and Rehan Chaurdhi, told M.B. to perform housework. Each of the defendants verbally abused M.B., calling her "whore, good for nothing, bastard, bitch" if M.B. completed "a chore, or anything in the house . . . not . . . according to their liking." (Tr. 441–42.) Each of the defendants slapped M.B. Each of the defendants participated in instances of more acute abuse: the Washington, D.C. incident (all defendants), the knife incident (Aman), the stairs incident (Aman,

---

[8] As the charged time period in this case ranges from 2000 to 2014, the government charged the defendants under the 2000 version of the forced labor statute, which did not include 18 U.S.C. § 1594 or any independent conspiracy charge for forced labor or sex trafficking. *See* 18 U.S.C. § 1589. The government, therefore, charged the defendants for conspiracy under § 371, which requires proof of an overt act.

Rehan Chaudhri), and the car incident (Aman, Nauman Chaudhri).[9]  Each of the defendants also told M.B.'s children that M.B. was "a crazy woman" who would "sell them out for money." (Tr. 519–20.)  Each of the defendants told the children not to go near M.B. or she would hurt them.

The fact that the defendants lived in the same home with M.B. during the twelve-year conspiracy also supports the existence of an agreement or understanding. *See United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984) ("To sustain the conspiracy conviction, there need only be a showing that defendant knew of the conspiracy's purpose and some action indicating his participation.  These elements can be shown by circumstantial evidence such as his relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy." (citation omitted)).   And to the extent the defendants argue that the conspiracy charge must fail because the government did not point to any explicit conversation between the defendants discussing their agreement, evidence of such an explicit agreement is not required for conviction. *See Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) ("The agreement need not be shown to have been explicit.  It can instead be inferred from the facts and circumstances of the case.").  The Court, therefore, finds that the government presented sufficient evidence that the defendants entered into an agreement or understanding to force M.B. to perform labor through abuse and threats of serious harm.

---

[9] Although Aman may have instigated this conspiracy, this evidence showed Nauman Chaudhri's and Rehan Chaudhri's participation. *See United States v. Roberts*, 881 F.2d 95, 101 (4th Cir. 1989) (affirming the district court's jury instruction that "one may become a member of the conspiracy without full knowledge of all of its details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy").

### ii. Knowledge of the Conspiracy's Purpose & Willful Entry into the Conspiracy

The evidence also allowed any rational trier of fact to find that the defendants knew the conspiracy's purpose and willfully joined. Not only did each of the defendants instruct M.B. to perform work and abuse her, but each of the defendants took steps to isolate M.B. and keep M.B. in the home. Aman took M.B.'s diary and forbade M.B. from speaking with her family. Rehan Chaudhri made M.B. explain to a congregant at their mosque that she had no interest in getting her driver's license; this incident could have led a reasonable juror to conclude that Rehan Chaudhri participated in the decision to not allow M.B. to drive and intended to dispel any suspicion held by this congregant that the family did not permit M.B. to drive. Nauman Chaudhri helped his mother drag M.B. back to the house after M.B. ran away. This evidence allows any rational trier of fact to find that each of the defendants willfully joined the conspiracy to compel M.B.'s labor with knowledge of the conspiracy's purpose.

### iii. Overt Act

Finally, the government presented sufficient evidence for a rational jury to find that at some point during the conspiracy, one of its members knowingly performed an overt act to further or advance the purpose of the conspiracy. As set forth above, M.B. testified that each of the defendants physically and verbally abused her, instructed her to perform services in their home, and took steps to conceal their crimes. "[B]ecause only one member of a conspiracy must commit an overt act," any one of these overt acts satisfies this element for each of the defendants. *United States v. Godwin*, 272 F.3d 659, 669 (4th Cir. 2001).

\*          \*          \*

22

For these reasons, the Court finds that the evidence, viewed in the light most favorable to the government, allowed any rational trier of fact to find the essential elements of the conspiracy beyond a reasonable doubt as to each of the defendants.

### b. Forced Labor (Count Two)

To establish forced labor, the government had to show (1) that the defendant provided or obtained the labor or services of a person, here, M.B.; (2) that the defendant did so by (A) threats of serious harm to, or physical restraint against, that person or another person; (B) means of a scheme, plan, or pattern intended to cause that person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (C) means of the abuse or threatened abuse of law or legal process; and (3) that the defendant acted knowingly. *See* 18 U.S.C. §§ 1589, and 2; *United States v. Calimlin*, 2:04cr248, ECF No. 188, Jury Instructions, at 33–34, 44 (E.D. Wis. May 25, 2006). The Court instructed the jury that a defendant acts knowingly if "he or she was conscious and aware of his or her action, realized what he or she was doing or what was happening around him or her, and did not act because of ignorance, mistake, or accident." (ECF No. 223, Jury Instruction 33, at 36.) The government also charged the defendants in Count Two with attempting to commit forced labor. (*Id.*, Jury Instruction 35, at 38.) The government could prove attempted forced labor by showing that (1) the defendant intended to commit the crime of forced labor as already defined; and (2) that the defendant did an act constituting a substantial step towards the commission of that crime. *See* 18 U.S.C. §§ 1589, and 2; *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996) ("[A] defendant can be convicted of an attempt only if the United States proves beyond a reasonable doubt (1) culpable intent to commit the crime charged and (2) a substantial step towards the completion of the crime that strongly corroborates that intent.").

23

The jury returned guilty verdicts for defendants Aman and Rehan Chaudhri as to the forced labor charge. Aman and Rehan Chaudhri urge the Court to acquit them of the forced labor conviction based on insufficient evidence.

### i. Obtained M.B.'s Labor or Services

The government offered sufficient evidence that both Aman and Rehan Chaudhri instructed M.B. to perform work. Although much of the work M.B. performed amounts to housework, that does not preclude Aman's and Rehan Chaudhri's convictions for forced labor under the forced labor statute. *See supra* Section III.A.2; *Callahan*, 801 F.3d at 614 (affirming the convictions for forced labor of defendants who forced the victim "to clean the apartment, do yardwork, care for their dogs, and run various errands for them"). Thus, the Court finds that the government presented sufficient evidence that Aman and Rehan Chaudhri obtained M.B.'s labor.

### ii. Through a Prohibited Means

The government also offered sufficient evidence that Aman and Rehan Chaudhri compelled M.B.'s work through a prohibited means. M.B. testified that Aman and Rehan Chaudhri verbally and physically abused M.B., threatened her with deportation, and isolated M.B. from her family, her children, and the world outside of the Chaudhri house. By abusing and manipulating M.B. in this way, Aman and Rehan Chaudhri compelled M.B.'s work around the house.

The defendants argue that the abuse M.B. endured did not relate to the labor or services she performed in the house. Although not every instance of abuse about which M.B. testified related directly to labor or services M.B. performed, certain instances did. For example, M.B. testified about the incident when Aman slapped her when M.B. she began her work late because she was tending to her sick infant daughter. In addition, the government asked M.B., "How

frequently did Rehan strike you? . . . Was it once a week, once a month?" (Tr. 456.) M.B. replied, "It depended on whatever their mood is. If I haven't listened to them, if their mom is angry, if [Aman] is angry for me, *if I didn't do the chore right*." (Tr. 456 (emphasis added).) M.B. explained that this abuse happened regularly. In these two instances, M.B.'s testimony made explicit the connection between the labor or services she provided Aman and Rehan Chaudhri and the abuse she endured from them.

As for the instances in which the abuse M.B. endured did not immediately relate to the labor she provided, these instances contributed to the climate of fear created by the defendants to coerce M.B. to remain working in the home. The Fourth Circuit has permitted such a line of reasoning. *See United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981) (affirming the defendants' convictions under 18 U.S.C. § 1584, the predecessor to 18 U.S.C. § 1589, and finding that "the record in this case readily establishes the climate of fear pervading [the defendants' agricultural] camp created by the beatings and assaults on the workers and threats of like treatment"); *United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) (affirming the defendant's conviction under 18 U.S.C. § 1584, the predecessor to 18 U.S.C. § 1589, based on the "reign of physical terror" created by the defendant and despite the lack of "evidence that [the defendant] personally ever assaulted [the victim] or threatened [the victim] with harm"); *Udeozor*, 515 F.3d at 266 (affirming the defendant's conviction under 18 U.S.C. § 1584, the predecessor to 18 U.S.C. § 1589, and explaining that "it was not an abuse of discretion for the trial judge to allow the jury to hear evidence that sexual abuse was used to make the victim believe she had no choice but to comply with the [defendants'] demands"). Thus, although the government did not offer evidence connecting certain instances of abuse M.B. endured with labor she performed, such

25

instances of abuse offer additional evidence of the prohibited means by which Aman and Rehan Chaudhri compelled M.B.'s labor.

Next, Aman and Rehan Chaudhri contend that three of the worst acts of violence M.B. described occurred after 2014, when the charged conspiracy ended. But, when viewing the evidence in the light most favorable to the government, two of the instances occurred before 2014. (*See* Tr. 507–12 (M.B. explaining that Aman and Rehan Chaudhri tied M.B. with rope and dragged and pushed her down the stairs after M.B. came inside after mowing the lawn, a chore M.B. says she stopped performing several years after the birth of her last child in 2008); Tr. 1083–84 (M.B.'s daughter, born in 2003, testified that her "head was just a little bit over the doorknob" when she witnessed Aman's daughter hold a knife to M.B.'s throat while Aman accused M.B. of lying).) But the timing of these instances notwithstanding, M.B. offered ample testimony—detailing years of abuse beginning after the birth of her first child in 2003—that allowed a reasonable jury to find that Aman and Rehan Chaudhri compelled M.B.'s labor through prohibited means.

Finally, the defendants argue that M.B. provided her labor willingly. Although M.B. may have volunteered her work at the beginning her time at the Chaudhri house, her initial consent does not excuse subsequent forced labor. *See Dann*, 652 F.3d at 1164–65 (affirming the defendant's conviction for forced labor even through the victim agreed to enter the United States and work for the defendants); *United States v. Bibbs*, 564 F.2d 1165, 1167 (5th Cir. 1997) (affirming the defendants' convictions for forced labor even though the victims initially agreed to work for the defendants).

### iii. Knowingly

Based on the evidenced outlined in Section III.A.3.a.ii, a reasonable jury could have found that Aman and Rehan Chaudhri acted knowingly when compelling M.B.'s labor.

26

* * *

For these reasons, the Court finds that the evidence, viewed in the light most favorable to the government, allowed any rational trier of fact to find the essential elements of forced labor beyond a reasonable doubt as to Aman and Rehan Chaudhri.

### c. Document Servitude (Count Three)

Finally, to establish document servitude, the government had to prove (1) that the defendant concealed, removed, confiscated, or possessed an actual or purported passport or other immigration document, or any other actual or purported government identification document, of the person, here M.B.; (2) that the defendant did so either (A) in connection with violating the forced labor statute; or (B) with the intent to violate the forced labor statute; and (3) that the defendant acted knowingly. *See* 18 U.S.C. §§ 1592 and 2; *Dann*, 652 F.3d at 1173; *Sabhnani*, 599 F.3d at 245.

Aman, the only defendant who stands convicted of document servitude, argues that the Court should acquit her of document servitude because M.B. "provided her [immigration] documents to [the defendants] to make her husband happy, [and] because her father-in-law kept all travel documents for the family." (ECF No. 248, at 17–18.) But the evidence at trial belies these arguments. M.B. testified that she initially refused to hand over her immigration documents to Aman. Only after M.S.C., S.C., and Aman confronted her and insisted did she capitulate; M.B. felt that she "had no choice except to go and bring [the documents]." (Tr. 434.)[10] After handing over her documents, M.B. testified that every time she would retaliate or refuse to abide by any

---

[10] Even if M.B. did consensually hand over her passport and immigration documents, such consent does not preclude Aman's guilt as to document servitude. *See Dann*, 652 F.3d at 1173–74 (affirming the defendant's conviction for document servitude pursuant to 18 U.S.C. § 1592 even though the victim gave the documents to the defendant for safekeeping, the victim never asked for the documents back, nor did she look for them herself).

instructions—about twice a month—the defendants would tell her to "calm [her]self down because [she could] be deported." (Tr. 438.) The defendants placed M.B. under the impression that she remained in the United States illegally. The only time M.B. ever saw her identification while living at the Midlothian house came when the family travelled to California: Aman presented M.B.'s identification to airport security and intervened when the security official attempted to return the card to M.B. herself. Thus, the jury heard sufficient evidence to conclude that Aman possessed M.B.'s immigration papers and did so to keep M.B. in the home performing work.

### B. Aman's and Rehan Chaudhri's Motions for a New Trial

#### 1. Legal Standard

Federal Rule of Criminal Procedure 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

"In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). But "[u]nder the applicable legal principles, a trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)), *cert. denied by Smith v. United States*, 549 U.S. 892 (2006); *see also Arrington*, 757 F.2d at 1485 ("When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.").

When a Rule 33 motion asks the Court to "evaluate for itself the credibility of witnesses," courts "should not lightly substitute its judgment for that of the jury." *United States v. Chin*, 181 F.3d 92 (Table), 1991 WL 333137, at *1 (4th Cir. May 26, 1999), *cert. denied Chin v. United States*, 528 U.S. 919 (1999). Indeed, a district court judge could find that "based upon the evidence presented" he or she "would not have found the defendant guilty beyond a reasonable doubt because [he or she] had some problems with the credibility of witnesses." *Id.* at *2 (quoting the district court during the post-trial hearing). But if the jury "didn't have those same problems" and the judge does not "have an abiding conviction that . . . a miscarriage of justice would occur," then the district court properly denies a motion for new trial. *Id.* (quoting the district court during the post-trial hearing).

"Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" *Ferguson*, 246 F.3d at 133–34 (alteration in original) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). Such exceptional circumstances arise "where testimony is 'patently incredible or defies physical realities.'" *Id.* at 134 (quoting *Sanchez*, 969 F.2d at 1414).

### 2. *Analysis*[11]

Only Nauman Chaudhri and Aman move for a new trial pursuant to Rule 33. Nauman Chaudhri does not make his Rule 33 arguments separately from his Rule 29 arguments; instead,

---

[11] In conducting this analysis, the Court considers evidence presented by both the government and the defendants during trial. The defendants offered witnesses who testified that they never witnessed abuse at the defendants' home, (*see, e.g.*, Tr. 1480 (Jim Webb, a neighbor), that M.B. was a valued member of the Chaudhri family, (*see, e.g.*, Tr. 1318–20 (B.A.)), and that M.B.'s children were happy and healthy, (*see, e.g.*, Tr. 1433–34 (Melissa Larry, the former teacher of M.B.'s second child, K.S.C.)). The defendants also presented many pictures showing M.B. with the Chaudhri family and M.B.'s children appearing happy and healthy. (*See, e.g.*, Def. Exs. 66-C,

he contends that the improper application of the forced labor statute and the lack of sufficient evidence support both his Rule 29 arguments and his Rule 33 arguments. As explained in Sections III.A.2 and III.A.3.a, the Court finds that the forced labor statute properly applied to the instant case such that allowing Nauman Chaudhri's conviction to stand does not result in a manifest injustice and sufficient evidence supports Nauman Chaudhri's conspiracy conviction. The Court will, therefore, deny Nauman Chaudhri's motion for a new trial.

Aman asserts a separate argument to urge the Court to grant a new trial: that M.B.'s testimony "was incredible and impeached repeatedly." (ECF No. 248, at 18.) In support, Aman points to eight statements that M.B. made during trial and evidence that challenges the veracity of each statement. The Court will consider each statement in turn.

### a. House Painting

M.B. testified that the defendants made her paint the exterior of the house. Aman explains that no witnesses supported this claim; indeed, neighbors "Mr. Webb and Mr. Bowling . . . said they never saw any female painting the exterior of the house." (ECF No. 248, at 18.) "Mr. Webb testified that when he moved out of his house in 2010, [the Chaudhri house] still had the original paint on it as when he moved into his home in 2000." (*Id.* at 18–19.)

Although Mr. Webb lived across the street, he worked away from the home, (Tr. 1475), and Ms. Bissett, who was formerly married to Mr. Webb, testified that she "lived on the back side of [her] house" so she only looked towards the defendants' home when she was coming or going from her own home, (Tr. 1205). As for Mr. Bowling, he could not see the Chaudhri house from his home, and he worked away from the home. (Tr. 1453–54, 1469.) Thus, the conflicting

---

76A, 76B, 77A.)   The defendants challenged M.B.'s testimony by drawing attention to inconsistencies between her retellings of the same incidents and to M.B.'s difficulty providing dates for certain incidents of abuse.

testimony of Mr. Webb and Mr. Bowling does not render unbelievable M.B.'s testimony about painting the exterior of the house.

### b. Concrete Walkway

M.B. testified that she replaced the concrete walkway twice. Aman explains that Mr. Webb's and Mr. Bowling's testimony contradicted this testimony; neither ever saw M.B. working on the walkway. (Tr. 1468, 1479.) In addition, Mr. Vega, a contractor who Aman hired to fix the walkway, testified that the walkway was very deteriorated when he began his work. (Tr. 894.) But as explained above, Mr. Webb and Mr. Bowling did not watch the house at all times; their not having observed M.B. work on the walkway does not compel the conclusion that the work did not occur. As for Mr. Vega's testimony, a jury could reasonably conclude that the work of someone inexperienced in constructing walkways could quickly deteriorate.

### c. Neighbor Interaction

Aman next cites M.B.'s testimony that the defendants forbade her from interacting with neighbors. Aman claims that the following testimony contradicts M.B.'s statement: Ms. Bissett's testimony that she interacted with M.B. on one occasion, Ms. Roarty's testimony that M.B. asked to borrow her phone, and Mr. Bowling's testimony about M.B. stopping on the street to talk to his child. (Tr. 564–65, 938, 1194, 1466–67.)

A jury could reasonably have believed this "contradictory" testimony and still have concluded that the defendants forbade M.B. from interacting with neighbors. Indeed, Ms. Roarty testified that M.B. appeared hesitant and nervous when borrowing the phone, suggesting that the defendants would not have approved of M.B.'s visit to Ms. Roarty. (Tr. 932.) Ms. Bissett testified that M.B. "always seemed to be alone," (Tr. 1193), and Ms. Bowling explained that M.B. would not interact with her on London Park Drive when the two would pass, (Tr. 1455). Thus, although

31

M.B. interacted with some neighbors, a jury could reasonably have found credible M.B.'s testimony that the defendants forbade such interaction.

### d. Immigration Status

Aman contends that M.B.'s "claim concerning lack of knowledge about her immigration status is also unbelievable." (ECF No. 248, at 19.)  In support of this position, Aman points to evidence that M.B., who has a college degree in English literature and participated in one year of a master's program in English Literature, (Tr. 609–10), "saw her green card" "[w]ithin ten days of arriving in the United States," "signed four individual letters addressed to the immigration office concerning her immigration status and green card," "travelled to the immigration office in Norfolk on two occasions and travelled to the CVS to obtain a passport photo," and "used her green card to travel to California." (ECF No. 248, at 19.)

M.B. explained, however, that her name was not spelled correctly on the green card she saw after arriving to the United States; she believed this inaccuracy rendered the green card invalid unless the spelling of her name was corrected. (Tr. 645.) As for her signature on the letters, M.B. testified that she was not allowed to see the documents; the defendants would cover the substance of the documents when M.B. signed them. (Tr. 527–28.)  On one occasion, M.B. asked Aman about the document she was asked to sign, and Aman explained, "It's nothing that you should be concerned about." (Tr. 528.)  M.B. also testified that she knew the immigration office was a government building, but the defendants never told her the purpose of the visits.  M.B. suspected the purpose of one such visit was to renew her passport. (Tr. 530.)  During another visit, she provided fingerprints, but she did not know why; she "wasn't allowed to question" and if she did, the defendants would punish her. (Tr. 530–31.)  As for the trip to California, M.B. testified that Aman held her identification during the trip, Aman handed M.B.'s identification to airport security

personnel, and Aman intervened when airport security personnel attempted to hand M.B.'s identification to M.B. Although M.B. caught a glimpse of her identification this day, this was the only time she saw her identification. Based on this evidence, a jury could reasonably have found credible M.B.'s statement that she did not know her immigration status while she lived with the defendants.

### e. M.S.C.'s Occupation

Aman also cites M.B.'s testimony that she did not know what her husband was doing for work outside the home as evidence of her unreliability. But review of this testimony shows that when M.B. said she did not know what her husband was doing for work, she may have meant that she did not know what type of medicine he practiced and in what sort of setting he worked. A jury interpreting this testimony could have reasonably concluded that M.B. knew her husband practiced medicine, but she just lacked the specifics; thus, M.B.'s testimony that she had "no idea" what her husband did for work does not undermine M.B.'s credibility as the defendants suggest. (Tr. 449.)

### f. Incidents of Abuse

Finally, Aman argues that M.B.'s testimony regarding three separate incidents of violence is "simply unbelievable." (ECF No. 248, at 20.) First, M.B. testified that Aman's daughter, B.A., "threatened to cut [M.B.'s] throat with a knife." (*Id.*) Although B.A. denied ever perpetrating violence against M.B., M.B.'s eldest child, F.S.C., testified to having witnessed this incident when she stood about the height of a doorknob. (Tr. 1083–84.) Although F.S.C. did not mention this memory to investigators until she had lived with M.B. for several years, the jury evaluated the

33

credibility of the witnesses and to the extent to jury believed that M.B.'s and F.S.C.'s testimony about the incident, such a belief was reasonable.

The second incident of violence Aman deems unbelievable is M.B.'s testimony that Aman, B.A., and Rehan Chaudhri tied M.B. up with a rope and dragged and pushed her down the stairs. M.B. did not tell investigators about this incident until 2021 and the details of the incident— whether she fell down the stairs at all, whether the rope was tied around her hands, whether she was "pushed" or "dragged" down the stairs—varies between M.B.'s retellings (in her journal, to investigators in 2021, and in court). (Tr. 695–97.) Although B.A. denied this incident, F.S.C. also testified about an incident involving a rope and her mother falling down the stairs. (Tr. 1085–86.) As with the first incident, F.S.C. did not mention this memory to investigators until she had lived with M.B. for several years. Despite this conflicting evidence, a reasonable jury could have believed M.B.'s testimony in whole or in part.

Aman also challenged M.B.'s testimony about Rehan Chaudhri hitting her with a 2x4. Aman finds this testimony incredible because neither Mr. Vega nor Ms. Roarty noticed that M.B. had any injuries when she asked to borrow their phones. Although observations of injury would have bolstered M.B.'s credibility, her testimony is not patently incredible without those observations. M.B. says that the 2x4 mostly hit her in areas that her clothing would have concealed. Although M.B.'s retellings of this event—to investigators, in her journal, in court— are not entirely consistent,[12] the bulk of her testimony remains the same: Rehan Chaudhri hit her

---

[12] These inconsistencies include whether Rehan Chaudhri pushed her into the laundry room, what item M.B. sought to retrieve from the laundry room—her scarf or her prayer rug and Quran, what M.B.'s interaction with Rehan Chaudhri was like before the strikes, and where exactly the 2x4 hit M.B. (*See* Tr. 700–07.)

six times with a 2x4 after he grew angry with her for not staying in the garage.  A reasonable jury could, therefore, have deemed credible M.B.'s testimony in whole or in part.

*                    *                    *

Having reviewed the evidence presented in this case, the Court does not find any exceptional circumstance that compels the Court to intrude upon the jury's credibility determinations.  The Court, therefore, finds that allowing Aman's convictions to stand does not result in manifest injustice; because "'competent, satisfactory and sufficient evidence' in the record supports the jury verdict," the Court will deny Aman's motion for a new trial.  *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

## IV.  **CONCLUSION**

For the foregoing reasons, the Court will deny the defendants' motions for a judgment of acquittal pursuant to Rule 29 and Aman's and Rehan Chaudhri's motions for a new trial pursuant to Rule 33.  (ECF Nos. 245, 246, 248.)  The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 16 August 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge