# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 3:19-cr-085 |
| ) | |
| ZAHIDA AMAN, ) | |
| ) | |
| MOHAMMAD NAUMAN CHAUDHRI ) | The Honorable John A. Gibney, Jr. |
| a/k/a/ Nauman Chaudhri, ) | |
| ) | |
| MOHAMMED REHAN CHAUDHRI ) | |
| a/k/a Rehan Chaudhri, ) | |
| ) | |
| Defendants. ) | |

## UNITED STATES SENTENCING MEMORANDUM

The United States of America, through undersigned counsel, hereby submits its sentencing memorandum. In this case, the defendants conspired to use physical violence, verbal abuse, and psychological coercion to compel M.B., their daughter- and sister-in-law, to perform thousands of hours of domestic services and physically demanding manual labor for twelve long years. Indeed, during the course of their illegal agreement and in furtherance of their criminal conspiracy, each defendant assaulted, verbally attacked, and abused M.B.'s children to carefully construct a climate of fear that continuously compelled her labor. At the conclusion of their conspiracy, the defendants took steps to conceal their conduct by banishing M.B. from the main part of their house, limiting her access to food and basic human interaction, and further separating her from her children. For these reasons and as further explained below, the United States respectfully submits that sentences within the sentencing guideline range for each defendant are appropriate under 18 U.S.C. § 3553(a).

## I.    Procedural History

On August 7, 2019, a grand jury returned a three-count indictment charging the defendants with Conspiracy to Commit Forced Labor in violation of 18 U.S.C. § 371 (Count One); Forced Labor in violation of 18 U.S.C. § 1589 (Count Two); and Document Servitude in violation of 18 U.S.C. § 1592 (Count Three). On May 13, 2022, after an eight-day trial, the jury convicted all three defendants of Count One; defendants Aman and Rehan Chaudhri of Count Two; and defendant Aman of Count Three. The Court scheduled sentencing for January 23, 2023.

## II.   Presentence Investigation Report

On January 6, 2023, the U.S. Probation Office issued its final Presentence Investigation Report (PSR). It determined the applicable guideline range for the defendants as follows: (1) 235 to 293 months of imprisonment for defendant Aman, based on an adjusted offense level of 38 and criminal history category of I; (2) 188 to 235 months of imprisonment for defendant Rehan Chaudhri, based on an adjusted offense level of 36 and criminal history category of I; and (3) 60 months of imprisonment for defendant Nauman Chaudhri, based on an adjusted offense level of 36, criminal history category of I, and the 60-month statutory maximum imposed on Conspiracy to Commit Forced Labor.[1]

In calculating the appropriate guideline range, the assigned Probation Officer correctly assigned an offense level of 32, pursuant to 2A4.1(a), with a 2-level increase pursuant to 2H4.1(b)(4)(B) in recognition of the fact that the defendants committed the Virginia state felony of kidnapping during their forced labor conspiracy. The Officer also correctly included a 2-level adjustment for each defendants' use of a minor in the commission of an offense pursuant to 3B1.4

---

[1] The PSR calculates defendant Nauman Chaudhri's guideline range at 188 to 235 months of incarceration, but recommends a 60-month sentence based on the maximum statutory penalty imposed by 18 U.S.C. § 371.

and a 2-level adjustment for defendant Aman's role as the leader and organizer of the offense under 3B1.1(c).[2]

For the reasons stated below, the United States respectfully requests that this Court adopt the PSRs' facts and guideline calculations and sentence the defendants to guideline sentences.

### III.   Argument in Favor of Guideline Sentences

The Supreme Court has declared "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" of all sentences. *Gall v. United States*, 552 U.S. 38, 41 (2007). Only after calculating the guidelines should the sentencing court "determine whether a sentence within that [guideline] range serves the factors set forth in [18 U.S.C.] § 3553(a)."

Section 3553(a)(1) provides that, in determining the sentence, courts must consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additional factors in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense and to promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (noting that subsection (a)(2) of section 3553 includes "factors that a court must consider in determining a particular sentence").

---

[2] The Probation Officer also included a 4-level increase for each defendants' use of weapon and a 3-level increase because each defendant held M.B. in involuntary servitude for more than one year, pursuant to 2H4.1(b)(2)(A) and 2H4.1(b)(3)(A) respectively. However, these increases are not ultimately included in the offense level given the application of the kidnapping guideline and corresponding 2-level increase imposed under 2H4.1(b)(4)(B).

Therefore, under Supreme Court and Fourth Circuit authority, a sentencing court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009). When the court, in consideration of the section 3553 factors, imposes a non-guideline sentence, it must give serious consideration to the extent of the deviation and provide an explanation "to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011) (internal quotation marks omitted).

Here, each of the defendants' conduct, considered in conjunction with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a sentence within the applicable sentencing guideline range.

### A. *Nature and Circumstances of the Offense*

The victim, M.B., grew up in Pakistan with her parents, paternal grandmother, and five siblings. Trial Transcript ("Tr.") 400-402. In 2001, defendant Aman arranged M.B.'s marriage to Salman Chaudhri (Salman), the eldest son of defendant Aman and brother of defendants Rehan and Nauman Chaudhri. Tr. 402, 405. M.B. felt significant pressure to make the marriage work as she was in her late 20s and "at least six" families had declined to enter into a marriage arrangement with her because she was "not good enough or pretty enough." Tr. 404. Moreover, M.B.'s marriage was the first major decision M.B.'s mother had made since becoming a widow. Tr. 402-03, 410-11.

In January 2002, M.B. married Salman in an Islamic wedding ceremony in Pakistan. Tr. 412. Contrary to common practice, M.B., who had not seen or spoken to Salman before the

ceremony, met Salman for the first time after the wedding. Tr. 405-406, 408, 413-14. At the conclusion of their wedding festivities, and the first time Salman and M.B. had the opportunity to spend time alone, Salman told M.B. that "if his family, especially his mother, Zahida Aman, is happy with [M.B.], he's going to put [M.B.] on a pedestal and [their] relationship will be good." Tr. 425.

The day after the wedding, Salman, defendant Aman, and her husband took M.B. to the embassy in Islamabad to apply for her marriage visa. Tr. 416-17. Approximately six weeks later, M.B. received her visa, boarded a plane for the first time ever, and flew to Washington, D.C. with her new husband and mother-in-law. Defendants Rehan and Nauman Chaudhri met defendant Aman, Salman, and M.B. at the airport and drove them to the family house, located at 2700 London Park Drive in Midlothian, Virginia. Tr. 426-28.

The slow process of taking control of M.B.'s life began almost immediately upon her arrival in the United States. Indeed, the day after M.B. arrived in Virginia, defendant Aman reiterated Salman's instructions about the marriage, explaining that the way to her husband's heart was through defendant Aman, adding "if you want [Salman] happy, you have to make me happy." Tr. 416-17, 429, 431. Shortly thereafter, defendant Aman began instructing M.B. to perform work in the house. Tr. 429-30.

During the early years of M.B.'s time at 2700 London Park Drive, M.B. worked for the defendants "all day . . . until [she went] to bed," including "clean[ing] the living room, the kitchen, the laundry room and the downstairs half bathroom before [the family came] downstairs," cleaning the deck when defendant Aman instructed her to do so, preparing meals, and washing the dishes. Tr. 429-430. While defendant Aman was the first person to instruct M.B. to perform domestic services, all three defendants routinely assigned her tasks during the twelve years she labored in

the home, causing her to "basically clean all day . . . until [she went] to bed." Tr. 442, 430. At first, M.B. complied with the defendants' instructions to complete work in the household because Salman and defendant Aman had told her that the success of her marriage depended on her ability to make the family happy. Tr. 430. Little did M.B. know that the harder she worked, the worse the defendants would treat her.

Shortly after M.B.'s arrival in the United States, defendant Aman instructed her to give defendant Aman her passport, visa, and other important documents. Tr. 431-32. When M.B. refused, defendant Aman and Salman held a family meeting to include defendant Aman's husband, defendants Nauman and Rehan Chaudhri, and M.B., where Salman instructed M.B. to surrender her personal and immigration paperwork to his parents for "safekeeping." Tr. 433-34. Feeling she "had no choice," M.B. acquiesced and turned over her Pakistani passport, identification forms, copies of her birth certificate, and educational certificates to defendant Aman. Tr. 432-34.

After M.B. handed over the documents, the defendants placed her in fear that she remained in the United States illegally, despite her legal status. Tr. 436. When M.B.'s green card arrived in the mail, defendant Aman and Salman showed it to her, pointing out that M.B.'s name was misspelled. Tr. 434-35. Because the defendants never showed her a corrected green card, she believed them when they repeatedly told her "we can deport you. Your paperwork is incomplete." Tr. 436, 438.

The defendants also made clear that upon her deportation, they would keep her children,[3] thereby making M.B. afraid she would be permanently separated from her kids if they sent her

---

[3] M.B. lived in the house from 2002 to 2016 and had children in 2003, 2004, 2006, and 2008. Tr. 468-69. Salman intermittently lived in or visited 2700 London Park Drive between 2002 and 2016 but spent most of the time living away from the house and working as a doctor in Pennsylvania and California. Tr. 448-51.

back to Pakistan. On one occasion, the defendants demonstrated their ability to separate M.B. from her children by leaving her on the side of the road while they drove off with her children during a day trip to Washington, D.C. Tr. 483-84. Because of the defendants' conduct and threats, M.B. believed that she was in the United States illegally and became "the robot of the house" who did "what they ask[ed] [her] to do" to ensure she could remain in the defendants' house with her children. Tr. 435-36, 439-40.

The defendants did more than confiscate M.B.'s immigration papers to isolate her from the outside world and compel her labor. Shortly after her arrival in the United States, defendant Aman seized several of M.B.'s personal effects, including the jewelry M.B.'s family gifted to her for her wedding and a notebook containing the contact information for M.B.'s friends and family in Pakistan. Tr. 431-32; 459-60. In addition, whenever M.B. would use the family telephone to contact her family in Pakistan, defendant Aman or another family member would stand by M.B., monitoring the telephone call. Tr. 459. By 2006, defendants prevented M.B. from using the telephone entirely and forbade her from having a cell phone. Tr. 459-61, 774. As a result, during her time in defendants' house, M.B. lost all touch with her family in Pakistan. Tr. 461. Indeed, when one of her brothers went to the defendants' home to find her in 2016, he did not know if she was alive or dead. Tr. 200-01.

As time passed, all three defendants required M.B. to perform increasingly laborious tasks in the home, including flipping the living room furniture and cleaning underneath, stripping and staining the deck by hand, mowing the lawn with a push mower, hand-washing and line-drying area rugs, painting the inside and outside of their two-story home, collecting sticks from the lawn by hand, picking out debris from car carpets with tweezers, and constructing a concrete walkway in front of the home—a task that required M.B. to haul large bags of concrete before mixing and

7

pouring cement. Tr. 466-67; 496-501. At various times, all three defendants instructed M.B. to perform this type of labor. Tr. 496-505.

As the type of work the defendants required M.B. to perform intensified, so too did their coercive scheme. By 2002, all three defendants had started verbally abusing M.B., calling her a "whore, good for nothing, bastard, bitch" should she complete "a chore, or anything in the house … not … according to their liking." Tr. 441-42. As a result, M.B. felt that she "had to work" and do "whatever [the defendants] asked [her] to do" in order to please her new family and make her marriage a success. Tr. 441-43.

The defendants started physically abusing M.B. in 2003, shortly after the birth of her first child. Tr. 453. The first violent episode occurred when M.B. came downstairs late to start her day of labor, following a sleepless night caring for a sick infant. Tr. 453. This upset defendant Aman, who "cussed [M.B.] out." Tr. 453. When M.B. apologized and said she would finish whatever defendant Aman directed her to do, defendant Aman slapped M.B. Tr. 453. Because of defendant Aman's slap, M.B. knew she had "no say" in the work the defendants instructed her to do in the home and knew she "had to do" whatever they told her. Tr. 458.

From that point forward, all three defendants participated in instances of physical abuse against M.B. in furtherance of their conspiracy to compel her labor. Indeed, M.B. testified that the defendants' violence usually occurred "[i]f [she hadn't] listened to them, if [defendant Aman was] angry, [or]… if [M.B.] didn't do a chore right." Tr. 456. For example, defendant Nauman Chaudhri slapped M.B. on a regular basis and, on one occasion, hit her with a plastic toy. Tr. 457-58. On another occasion, defendant Aman's daughter Bushra, an unindicted co-conspirator, verbally abused M.B. "for not doing a chore" or because "the kids were making noise." Tr. 506. When M.B. failed to apologize, Bushra held a knife to M.B.'s throat while Aman accused M.B. of lying.

Tr. 506-07, 1083-84. On a different date, Bushra, defendant Rehan Chaudhri, and defendant Aman tied M.B. up with a rope and pushed her down the stairs in front of her children to punish her for taking defendant Rehan Chaudhri's phone in an attempt to call her husband. Tr. 510-11, 966, 1085. On yet another occasion, defendant Rehan Chaudhri beat M.B. with a wooden board. Tr. 456-57. Because of these and other violent incidents, M.B. believed that she had to comply with the defendants' demands, lest she suffer physical and emotional pain.

The defendants further exerted control over M.B. by restricting her access to food, sleep, and modern conveniences, thereby weakening her ability to resist their demands and contributing to the climate of fear they used to further their criminal agreement to compel her labor. Tr. 430, 498-99, 552-56. Indeed, M.B. was not permitted to eat with the family and had to ask permission when she did eat. Tr. 508, 556-57. When the defendants suspected that M.B. was taking food without their permission, defendant Aman installed a refrigerator in defendant Aman's room and moved most of the groceries upstairs to further restrict M.B.'s access to food. Tr. 554, 556, 1014. Because of the defendants' conduct, M.B. lost so much weight while living in the house that her brother did not recognize her when he found her in 2016. Tr. 207.

The defendants added to, and exacerbated the difficulty of, M.B.'s work by restricting her access to modern appliances, despite their availability in the home. For example, the defendants prevented M.B. from using the washer and dryer, lawn tractor, and the dishwasher, thereby forcing M.B. to do the majority of her work in a more time- and labor-intensive fashion. Tr. 430, 498, 504, 1080, 1198. On one occasion, defendant Nauman Chaudhri instructed M.B. to pick debris out of their car with tweezers and a magnifying glass, despite the availability of a vacuum in the home. And defendants required M.B. to perform her work, often without the use of technology, up to the day she delivered each of her four children. Tr. 504-05.

The defendants also isolated M.B. from her four children. In the early years, defendant Aman did not allow M.B. to take breaks from her work to breastfeed, except on the rare occasions when defendant Aman gave her permission. Tr. 452-53. As the children grew older, the defendants stripped M.B. of her maternal duties completely and became the children's primary caregivers. Tr. 469-72. Moreover, defendant Rehan and Nauman Chaudhri listed themselves and defendant Aman on school registration paperwork as primary guardians and emergency contacts. Tr. 825-28, 834-37, 839-45, Gov't Exh. 17-20. Additionally, defendants Aman and Rehan Chaudhri routinely told the children that their mother was mentally ill and abusive, causing them to fear and hate their mother. Tr. 511-12, 516, 519-20, 952, 954-58, 1074-77. Defendant Aman also encouraged the children to participate in acts of abuse against M.B., including hitting her and spitting on her, to further prevent them from forming healthy relationships with their mother. Tr. 513-14.

The defendants furthered their conspiracy to compel M.B.'s labor by physically and psychologically abusing her children. On one occasion, defendant Aman forced M.B.'s daughter to stay in the laundry room for hours as punishment for telling the family that she "needed" her mother. Defendant Aman and her daughter then forced M.B. to slap herself in front of her other children to secure the daughter's release. Tr. 514-16. On other occasions the defendants hit the children and withheld food from them. Tr. 514-16, 972-76. Once, defendant Nauman Chaudhri dragged M.B.'s youngest child upstairs and he and defendant Aman yelled at the child for talking to M.B. Tr. 516-18.

The defendants' collective conduct was so egregious that M.B. attempted to run away from the house, causing defendants Aman and Nauman Chaudhri to chase her in their car, grab her by the scarf she was wearing around her neck, and forcefully pull her into their vehicle. Tr. 543-44.

After they took her back to the house, defendants Rehan and Nauman Chaudhri dragged her inside. Tr. 545.

The impact of the defendants' criminal conspiracy was so complete that M.B. tried to end her life on two occasions, first by taking rat poison and then by overdosing on sleeping pills. Tr. 533-38; Gov't Exh. 3A and 3B. On both occasions, the defendants brought M.B. to the hospital, but sought no mental health help for her, instead instructing her to resume her work soon after discharge. Tr. 537, 539.

Eventually, the defendants moved M.B. into the laundry room, where she slept on a mat on the floor. Tr. 553-54, 558. At this point, the defendants "gradually" stopped forcing her to perform work in the home, choosing instead to ignore her presence entirely. Tr. 552-54. Subsequently, the defendants converted their garage into a small annex where they eventually exiled M.B. Tr. 568. During this time, M.B. could leave the annex, but could not access the house because the defendants barricaded the door connecting the annex to the home with a wooden board. Tr. 568-69, 991. Defendant Aman told K.S.C., one of M.B.'s children, that she could move into the annex "once we get rid of your mom." Tr. 992.

In March 2016, M.B.'s brother, N.B., while visiting the United States, went to the defendants' house to find M.B. Tr. 203. When N.B. first saw M.B. standing outside defendant's house, he did not recognize her due to the significant weight and hair loss caused by defendants' conduct. Tr. 206-07. However, when M.B. recognized her brother, she fell to her knees, thanking God he had found her. Tr. 208.

Alarmed by M.B.'s physical appearance, and the condition of the annex, N.B. urged M.B. to leave the home. Tr. 223, 225. M.B. refused, citing her fear of leaving the children alone in the home. Tr. 223, 225. N.B. returned to Pakistan pursuant to the requirements of his visa, but not

before purchasing M.B. a cell phone with which she was able to reconnect with her family without the defendants' knowledge. Tr. 223-26. In May 2016, after M.B. rebuilt her relationships with her family and gained emotional courage, N.B. returned to Virginia at M.B.'s request and helped her leave the home. Tr. 226-27. While assisting M.B. leave, N.B. observed defendant Nauman Chaudhri slap M.B. in the face and called 911. Tr. 231. The police officer who responded observed red marks on M.B.'s face consistent with the assault and arrested defendant Nauman Chaudhri for domestic violence. Tr. 231, 233, Gov't Exh. 16.

After leaving the defendants' house, M.B. reported their conduct to Detective Laura Kay of the Chesterfield Police Department. Tr. 375-76. Since that time, M.B. has gained full custody of her children, who spent over a year in foster care because of the defendants' conduct, and currently lives a happy life in Connecticut with her kids. Tr. 600-602, Gov't Exh. 12.

### B. History and Characteristics of the Defendants

Overall, the defendants' personal characteristics support a guideline range sentence and do not establish any extraordinary circumstances warranting a downward departure or variance from the applicable guideline range. The PSRs do not reveal anything remarkable about the defendants' childhoods or backgrounds that explain or mitigate the serious offense conduct. Indeed, the defendants' privileged lives indicate all the more that a guideline sentence is appropriate. None of the defendants report a history of mental or emotional health concerns or substance abuse issues. Moreover, all three defendants report growing up in stable and supportive environments where they were afforded ample opportunity to build stable family lives and, with respect to defendants Chaudhri, pursue advanced education and degrees in medicine. Therefore, the history and characteristics of the defendants warrant a guideline sentence.

The defendants' family ties do not warrant a departure from a guideline sentence. "Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. 5H1.6; *United States v. Mogel*, 956 F.2d 1555, 1562 (11th Cir. 1992) (interpreting Section 5H1.6 "as prohibiting departures from the sentence range in all but extraordinary cases"). These defendants' family ties and responsibilities, which include an elderly spouse and father suffering from health concerns, is neither extraordinary nor would the imposition of a guideline sentence render him without care. Indeed, other members of the family, including Amna Ayaz and his two other adult children—Salman Chaudhri and Bushra Ayaz—are available to fund and/or provide care to the extent continued non-professional home health care is medically indicated. Therefore, the defendants' family ties, when balanced with the other sentencing factors—including the nature and circumstances of the offense—do not warrant deviating from a guideline sentence.

Defendant Aman's age, when balanced with the other sentencing factors, also does not warrant a sentence outside the sentencing guidelines. Defendant Aman, who will be approximately 80 years old at the time of sentencing, was approximately 60 when she and her codefendants entered into their violent, verbally abusive, and psychologically damaging conspiracy. Moreover, defendant Aman was over 70 when M.B. escaped the home. Therefore, defendant Aman was of considerable age for the entirety of the twelve years she beat, verbally abused, and psychologically coerced M.B. to compel thousands of hours of laborious services in her home. Because of her age at the time she committed her crimes, she should not get the benefit of her age at sentencing. *See United States v. Lakhani*, 480 F.3d 171, 186 (3rd Cir. 2007) (imposing a 47-year sentence on 71-year-old defendant for attempting to provide material to support terrorists and noting that the

defendants' age and health, when balanced with the severity of the offense and other sentencing factors, did "not offer mitigation").

Furthermore, while the defendants have limited criminal histories, the guideline ranges in the PSRs already incorporate a calculation of zero for their criminal history score and criminal history category of I. Therefore, their criminal histories do not warrant a downward departure. *See* U.S.S.G. 4A.3(b)(2)(A) (prohibiting a "departure below the lower limit of the applicable guideline range for Criminal History Category I").

### C.   *Seriousness of the Offense*

The defendants' conduct, as set out in greater detail above, demonstrates the seriousness of their offenses. For over twelve years, each of the defendants participated in a criminal conspiracy designed to dehumanize M.B. and force her to toil endlessly as their personal servant. Indeed, all three defendants conspired to force M.B. to work "all day . . . until [she went] to bed," Tr. 429-30, thereby causing her to clean, flip furniture, strip and stain the deck by hand, mow the lawn with a push mower—sometimes in extreme heat while pregnant—hand-wash and line-dry area rugs, paint the inside and outside of their two-story home, collect sticks from the lawn by hand, pick out debris from car carpets with tweezers and a magnifying glass, and construct a concrete walkway in front of the home.

The severity of the labor each defendant conspired to force M.B. to perform was matched by the seriousness of their coercive scheme. Indeed, all three of the defendants furthered their criminal conspiracy with a barrage of physical abuse, verbal degradation, isolation, starvation, and the deprivation of basic necessities. Moreover, their conduct was made more serious given their family relationship with M.B. This is the rare case where the defendants lived in the same home as the victim for fourteen years. M.B. slept across the hallway from the defendants, then

downstairs, then in the converted garage, but the entire time she was their daughter- or sister-in-law, a member of the family. Despite the defendants' familial and temporal proximity to M.B., nearly every day they conspired to physically and verbally abuse her, ordered her to perform extreme labor for long hours every day, and deprived her of common expediencies like a bed and sufficient nutrition. Every day they looked in her eyes and revictimized her again and again and again.

The degree of their cruelty was so severe that M.B. suffered physical, mental, and psychological repercussions because of the defendants' conspiracy.[4] With respect to M.B.'s physical health, each of the defendants hit M.B. if "a chore or anything in the house that they have asked [her] to do [was] not done according to their liking." Tr. 441-42. Moreover, the defendants compelled M.B. to perform long hours of laborious physical tasks while depriving her of adequate sleep or nutrition. Indeed, the defendants limited M.B.'s access to food to such an extent that she, as a 5'4" woman, lost approximately 60 pounds and clumps of hair while living in their house. The result of M.B.'s physical transformation, as caused by the severity of the defendants' conspiracy, was so staggering that M.B.'s own brother did not recognize her when he first encountered her at 2700 London Park Drive.

The seriousness of each defendants' conduct also impacted M.B.'s mental wellbeing. All three of the defendants verbally abused M.B. to further their criminal agreement, calling her a "bitch," "whore," and "good for nothing" on a regular basis. *Id.* Their constant verbal abuse over the twelve years she tirelessly labored in their house made her feel like she was worthless and that she had to continue working. Moreover, all three of the defendants isolated her from the outside

---

[4] M.B. will provide the Court with an in-person victim impact statement at sentencing pursuant to 18 U.S.C. § 3771(a)(4).

world by telling her she was in the United States illegally and could be deported, thereby implicitly threatening to separate her from her children. By doing so, each of the defendants preyed upon her fears of deportation and weaponized the love she had for her children to further their illegal agreement.

The seriousness of each defendants' cruelty also impacted M.B.'s familial relationships. By forbidding her from speaking to her family in Pakistan, the defendants destroyed her relationship with her mother and siblings to such an extent that her brother did not know if she was alive or dead when he went looking for her at the defendants' home.[5] The defendants also forbade her from speaking to neighbors and members of their religious community, effectively leaving M.B. with no friendships or positive human interaction for twelve years.

Perhaps the worst punishment the defendants inflicted on M.B. was the wedge they drove between her and her children.[6] They convinced her children that their mother was a monster and dangerous to them, beat them, forced them to spit on her, belittled and punished them when they showed any kindness or affection to their mother, and usurped her role as a mother. Defendants Chaudhri registered M.B.'s children for school, listing themselves and defendant Aman as the kids' guardians and emergency contacts on the registration forms. Their success at alienation was so successful that when Nauman Chaudhri slapped M.B. the night she left the house and the responding officer allowed M.B. to finally see her children, their reaction was fear of their mother instead of love. It is only after her children spent over a year in foster care and countless hours of

---

[5] M.B.'s mother and brother provided written victim impact statements pursuant to 18 U.S.C. § 3771(a)(4), attached herein in Attachment A.

[6] M.B.'s child, K.S.C. provided a victim impact statement pursuant to 18 U.S.C. § 3771(a)(4), attached herein in Attachment A. The United States anticipates that M.B.'s oldest child, F.S.C., will also provide a victim impact statement that will be provided to the parties and Court when received.

therapy and recuperation that M.B. has managed to build relationships with her children. Despite their vastly improved relationships, the defendants' criminal conspiracy robbed M.B. of over a decade of her kids' lives that she will never get back.

### D. *Need for Sentence to Provide Just Punishment and Afford Adequate Deterrence*

A guideline sentence for each defendant is necessary to provide a just punishment for the severity and seriousness of their respective conduct and afford necessary specific and general deterrence. With respect to specific deterrence, it is notable that the defendants never voluntarily released M.B. from their home. Indeed, they took great steps to conceal their criminal conduct and secrete her from the outside world during the entirety of their conspiracy and in the years that followed. Therefore, there is no indication that the defendants would have voluntarily ceased their conduct had M.B.'s brother not extracted her from the home. The heartlessness of the defendants' conduct, combined with their unwillingness to cease their victimization of M.B., suggests a guideline sentence would serve as appropriate specific deterrence.

A guideline range would also afford a necessary deterrence to prevent the criminal conduct of others inclined to engage in similar offenses. As this Court noted, despite the unique intricacies of the defendants' conduct, this case is, "in many ways . . . precisely what the forced labor statute seeks to reach." ECF 252 at 14 (citing *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) ("Most [forced labor cases arising in the household context] involve defendants that subjected their victims to more extreme isolation. . . ."); *United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008) (affirming forced labor convictions of the defendant who confiscated the victim's travel documents and used threats related to her immigration status to compel her to continue); *United States v. Sabhnani*, 599 F.3d 215, 225-28 (2d Cir. 2010) (affirming forced labor conviction of the defendant who physically abused the victim, prevented her from possession of her passport, and

subjected her to intolerable living conditions)). Indeed, the federal forced labor and corresponding conspiracy statues were passed to combat the "growing transnational crime" of sex trafficking and forced labor where "traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable." H.R. Conf. Rep. No. 106-939 at ¶ 3, 6 (2000), 2000 WL 1479163 (Oct. 5, 2000). Because the defendants' actions in this case are in many ways characteristic of those that conspire to use coercive means to force others into labor, a guideline sentence would send the message to persons who are contemplating bringing individuals to the United States to obtain free labor that they stand to lose their liberty.

## IV. Conclusion

For the foregoing reasons, the United States respectfully requests that this Court impose sentences within the guidelines. Such sentences are sufficient, but not greater than necessary to satisfy the purpose of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Shea Matthew Gibbons
Virginia Bar No. 83916
Stephen Miller
Virginia Bar No. 23704
Assistant United States Attorneys
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Telefax: (804) 771-2316
Shea.Gibbons@usdoj.gov
Stephen.Miller@usdoj.gov

        KRISTIN CLARK
        ASSISTANT ATTORNEY GENERAL

By: _____/s/_____
    Leah Branch
    Trial Attorney
    950 Pennsylvania Avenue
    NW Washington, DC 20004
    Phone: (202) 598-1459
    leah.branch@usdoj.gov