**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:19-cr-085 |
| | ) | |
| ZAHIDA AMAN, | ) | |
| | ) | |
| MOHAMMAD NAUMAN CHAUDHRI | ) | The Honorable John A. Gibney, Jr. |
| a/k/a/ Nauman Chaudhri, | ) | |
| | ) | |
| MOHAMMED REHAN CHAUDHRI | ) | |
| a/k/a Rehan Chaudhri, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES OMNIBUS RESPONSE TO DEFENDANTS'
SENTENCING MEMORANDA**

The United States of America, through its undersigned attorneys, respectfully submits this Omnibus Response to the Defendants' Sentencing Memoranda. ECF 267, 268, 269, 270, 273, & 275. For the reasons stated below, the Presentence Investigation Reports (PSRs) properly calculate the defendants' sentencing guidelines. Moreover, the defendants' sentencing memoranda failed to establish an adequate basis for downward departures or variances. Accordingly, the United States respectfully requests that this Court sentence the defendants within the guideline sentences outlined in the PSRs.

## I.    The Defendants' Factual Objections

The sentencing court "must" rule on any disputed portion of the PSRs "or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. Pro. 32(i)(3)(B). The legal standard for making findings of fact relevant to sentencing is "preponderance of the evidence." *United States*

*v. Cox*, 744 F.3d 305, 308 (4th Cir. 2014) (citing *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008)).  Moreover, the "traditional rules of evidence are not applicable at sentencing" and the court "may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability." *See United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010) (citations omitted).

With respect to factual objections, "[t]he defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990); *see also United States v. Rodriguez-Delma*, 465 F.3d 1246, 1253 (10th Cir. 2006) ("To invoke the district court's Rule 32 fact-finding obligation, the defendant is required to make specific allegations of factual inaccuracy."). Here, all three defendants make blanket objections to the factual summary included in the PSRs, without any degree of specificity or supporting proof. Instead, they wholly object to the PSRs, claiming the PSRs "accept M.B.'s testimony as true." ECF 275 at 1; ECF 267 at 1; ECF 270 at 1.

By making stock objections, without specificity or supporting evidence, the defendants fall short of their burden with respect to proving the inaccuracy of the factual statements in the PSR. *See Terry*, 916 F.2d at 162 (noting that the burden is on the defendant to show the inaccuracy or unreliability of the PSR); *see also United States v. Gracia*, 983 F.2d 625, 629 (5th Cir. 1993) (noting that PSRs "generally bear indicia of reliability sufficient to permit reliance thereon at sentencing" and the defendant bears the burden of demonstrating its untruth, inaccuracy, or unreliability); *United States v. Aleman*, 832 F.2d 142, 145 (11th Cir. 1987) (holding that "challenges to the PSI must assert with specificity and clarity each factual mistake of which defendant complains" to trigger the application of Fed. R. Crim. Pro. 32(c)(3)(D)). Therefore, the

defendants' factual objections should be overruled.

Moreover, the jury found M.B. credible, as evidenced by its findings of guilt as it relates to all three defendants. *United States v. Safley*, 408 F.2d 603, 605 (4th Cir. 1969) (noting that "jurors are the sole judges of the credibility of the witnesses"). This Court saw no reason to disturb the jury's verdicts, even when considering M.B.'s credibility as permitted by Fed. R. Crim. Pro. 33 and the trial evidence presented by all parties. ECF 252 at 29-30 & n.1. As the jury's credibility determination regarding M.B.'s credibility was central to their findings of guilt beyond a reasonable doubt, the factual summaries in the PSRs are supported by at least a preponderance of the evidence.

The sworn testimony at trial is also dispositive of the specific factual denials outlined in the PSRs. ECF 264 at 29-30; ECF 265 at 29-30; and ECF 266 at 27-28. Again, the United States presented sworn testimony, supporting evidence, or some combination thereof establishing every fact included in the PSRs. After hearing this evidence, the jury convicted all three defendants of conspiracy to commit forced labor and related crimes. In their objections, the defendants make blanket denials without presenting evidence in support of their specific objections. The United States respectfully requests that this Court deny the defendants' factual objections to the PSRs.

## II.    Application of Kidnapping Cross Reference Under U.S.S.G. § 2H4.1(b)(4)

All three defendants object to the kidnapping cross-reference, applying the kidnapping base level offense outlined in U.S.S.G. § 2A4.1, pursuant to U.S.S.G. § 2H4.1(b)(4), applying § 2A4.1 for kidnapping/abduction. ECF 270 at 7-9; ECF 275 at 2-3; ECF 267 at 2-3. Those objections are without merit. The PSRs correctly apply section 2H4.1(b)(4), which provides that "[i]f any other felony offense was committed during the commission of or in connection with, the peonage or involuntary servitude offense," the Court must either add two points to the base offense level in

2H4.1 or add two points to the offense level that would result from the guideline applicable to the other felony offense, whichever results in a higher guideline level. As defendants kidnapped/abducted M.B. in violation of Virginia state law[1] in the course of their conspiracy to commit forced labor, the PSRs correctly apply section 2A4.1, which governs cases involving kidnapping and abduction. This section carries a base offense level of 32, which was then increased to 34, pursuant to 2H4.1(b)(4).[2]

Defendants assert that the Court should not apply the section 2A4.1 cross reference as Virginia law prohibits abduction with the intent to subject the victim to involuntary servitude. VA Code Ann. § 18.2-47(b). From this they conclude that the abduction of M.B. is not a separate offense from the offense of conviction. To apply the cross-reference, then, they argue, is double counting. In addition, defendants Aman and Nauman Chaudhri assert that they were charged with the abduction in state court, but were convicted of a lesser offense. From this they assert that the Court cannot conclude that they kidnapped or abducted M.B.

Double counting occurs "when a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision or by application of a statute." *United States v. Dowell*, 771 F.3d 162, 170 (4th Cir. 2014) (quoting *United States v. Reevey,* 364 F.3d 151, 158 (4th Cir. 2004)). The Fourth Circuit has explained that "there is a presumption that double counting is proper where not expressly prohibited by the guidelines." *United States v. Hampton,* 628 F.3d 654, 664 (4th Cir. 2010). Application Note 2 to section 2H4.1 explains that the cross-section applies to any other

---

[1] Application Note 2 to § 2H4.1 explains that "any other felony offense" means "any conduct that constitutes a felony offense under federal, state, or local law . . . ."

[2] The adjusted offense level under § 2H4.1 would be 31, below the 34 that results by applying 2A4.1. *See* ECF 264 at 14.

federal, state, or local felony conviction, "other than an offense that is itself covered by" the guideline provision. Thus, the cross section applies unless kidnapping/abduction is already covered by the federal involuntary servitude guideline section. In this case it is not. There is nothing in the guideline that covers kidnapping or abduction, therefore there is no double counting.

Nonetheless, the defendants assert that the Virginia abduction and kidnapping statute includes forced labor, "so it is not a separate felony offense that provides a basis for a cross reference." ECF 270 at 8. In support of this argument, defendants cite but one section of Virginia Code § 18.2-47, which provides:

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secrets another person with the intent to subject him to forced labor or services shall be deemed guilty of 'abduction.'

VA Code Ann. § 18.2-47(b).

However, subsection (b) is just one of the two means of committing kidnapping/abduction under Virginia law. Accordingly, the defendants failed to acknowledge the first provision of the statute, which provides:

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of 'abduction.'

VA Code Ann. § 18.2-47(a).[3] This is a separate offense from the one that undergirds defendants' argument. In *Blockburger v. United States*, 284 U.S. 299, 304 (1932), the Supreme Court explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each

---

[3] Notably, defendant Nauman Chaudhri was charged under this section for kidnapping M.B. *See* Exhibit A, indictment of Mohammad Nauman Chaudhri. The attached indictment does not cite a subsection, but the language in the indictment tracks subsection (a) and does not mention forced labor or services, as in subsection (b).

provision requires proof of a fact which the other does not." In applying this test, courts look solely at the elements of the crimes, not the underlying facts of the case. *United States v. Ayala*, 601 F.3d 256, 264-65 (4th Cir. 2010).

Here, the two statutes each contain an element the other does not: subsection (a) requires intent to deprive a person of his liberty or to withhold or to conceal that person, while subsection (b) requires intent to subject the person to forced labor or services. Thus, a defendant could commit abduction/kidnapping without involuntary servitude and involuntary servitude without abduction/kidnapping. And, because they are separate offenses, a defendant could be charged and convicted of violating both sections of section 47 based on the same conduct.

Here, defendants took M.B. against her will as she left the London Park Drive residence, and forcibly and in restraints, brought M.B. back to that residence. That is a violation of section 47(a) regardless of whether the defendants were also engaged in involuntary servitude. It is this section that triggers the cross reference and an adjusted offense level of 34.

Further, the arguments of defendants Aman and Nauman Chaudhri that they were charged with, but not convicted of a state abduction offense does not negate application of the cross reference. As understood by the United States, the defendants argue that because they were ultimately convicted of misdemeanor offenses, these convictions serve as no proof of felony abduction. While that assertion is correct, the conclusion that this conduct does not amount to abduction or kidnapping is misplaced. This Court looks to the underlying conduct, not to any resolution of the matter in another jurisdiction. Certainly, actual felony violations are pled down to misdemeanors all the time, for a variety of reasons that do not constitute an acquittal of more serious conduct. And, indeed, the Court may even rely on acquitted conduct in applying an enhancement. *United States v. Watts*, 519 U.S. 148, 153 (1997). Thus, the resolution of charges in

6

the state does not resolve the issue here.

Although defendants continue to deny any wrongdoing in this case, the jury did not accept their arguments, instead crediting M.B. and her daughters' testimony that defendants Aman and Nauman Chaudhri kidnapped M.B. and forced her against her will back to the Chaudhri house, where defendant Rehan Chaudhri was waiting for them. Despite this testimony, the defendants have utterly denied any responsibility for any of their vile treatment of M.B., with the abduction being no exception. They claim the Court should pretend the event never occurred because there is no credible corroboration for M.B. with respect to this. But, the testimony of M.B. alone is sufficient. *United States v. Arrington*, 719 F.2d 701, 704-05 (4th Cir. 1983) (the uncorroborated testimony of one witness is sufficient to sustain a guilty verdict); *United States v. Boddy*, 622 F. App'x 219, 221 (4th Cir. 2015) (unpublished).

Further, the general version of events is corroborated by both F.S.C. and K.S.C. As part of his affirmative denial of responsibility for his abuse of M.B., defendant Nauman Chaudhri attacks the credibility of K.S.C. regarding the abduction.[4] Using the date listed on his state indictment, the defendant asserts that the event occurred in June 2006. K.S.C. could not have witnessed or at least recalled this, he argues, because on the date he has assigned for the event, K.S.C. was less than two years old. ECF 267 at 5.

Defendant Nauman Chaudhri is applying a level of chronological certainty that is simply impossible to know. As the defendant and his family continued to hold M.B. in servitude and

---

[4] K.S.C. testified that she recalled a night when her mother had "gotten locked out. She had kind of, like, disappeared." Tr. 978. When the family could not find her, K.S.C. remembered others went out to find her. Later that night, K.S.C. saw M.B back at the house again, "curled up in the corner upstairs in front of the bathroom where the ironing board was in the corner right next to the staircase." *Id*. K.S.C. later learned that the searchers had found M.B. "near some bushes outside of the little neighborhood." *Id*. She believed that defendant Aman and defendants Nauman and Rehan Chaudhri were the ones who had gone looking for her. *Id*.

deprive her of access to the outside world, there was no contemporaneous report of the incident to authorities. The defendant's state indictment does not resolve the date issue. First, there are actually two indictments of defendant Nauman Chaudhri for abducting M.B. Both were returned on November 14, 2016, nearly a decade after the event(s) actually occurred. Further, in both instances, the date is far from clear, charging in one instance that the abduction occurred "on or about 06/01/2006-08/31/2006," and the other charging defendant Nauman Chaudhri with an abduction of M.B. "on or about 06/01/2007-08/31/2007." Such lack of any clarity on the actual date is no grounds for discounting the testimony of K.S.C. or M.B. herself.

F.S.C. also corroborates the defendant's abduction of M.B. While F.S.C. was in her room at the time of the incident, she recalled defendant Rehan Chaudhri yelling that M.B. had gone and defendant Aman yelling for someone to get the keys. Defendants Aman and Nauman Chaudhri then left in a car to retrieve M.B., returning with her a short time later.[5] Tr. 1092. Thus, despite some uncertainties about the date of an event that occurred more than a decade ago, three witnesses all testified that M.B. was abducted and/or kidnapped, and all three defendants pled guilty to state charges related to the abduction. This abduction/kidnapping constitutes a state felony offense, and thus the cross reference to kidnapping is proper and valid.

## III.    The Defendants' Uses of Dangerous Weapons Under U.S.S.G. § 2H4.1(b)(2)(A)

As an initial matter, while all three defendants object to the 4-point enhancement for use of a dangerous weapon, this enhancement is not operative in any of the defendants' guidelines calculations due to the cross reference for kidnapping. In other words, if the cross reference for kidnapping is applied, then the defendants' objections to the enhancement for use of a dangerous

---

[5] Defendant Aman was initially charged on November 22, 2016 with two counts of felony abduction of M.B. On June 1, 2017, she pled guilty to two counts of misdemeanor assault and battery of a family member, M.B.

weapon are moot. However, if the Court is disinclined to apply the kidnapping crossover, the 4-level adjustment of section 2H4.1(b)(2)(A) is applicable to each defendant.

Fourth Circuit precedent indicates that the test for whether an object is a dangerous weapon depends on the object's ability to inflict serious injury when put to assaultive use:

> The Guidelines define "dangerous weapon" as "an instrument capable of inflicting death or serious bodily injury," USSG § 1B1.1, application n. 1. We previously have held that "what constitutes a dangerous weapon depends not on the object's intrinsic character but on its capacity, given 'the manner of its use,' to endanger life or inflict serious physical harm." *United States v. Sturgis,* 48 F.3d 784, 787 (4th Cir. 1995) (quoting *United States v. Johnson,* 324 F.2d 264, 266 (4th Cir. 1963)). *See also United States v. Moore,* 846 F.2d 1163, 1166 (8th Cir. 1988). Accordingly, an instrument need not be inherently dangerous to be a dangerous weapon, and "innocuous objects or instruments may become capable of inflicting serious injury when put to assaultive use." *Sturgis,* 48 F.3d at 787.

*United States v. Perry*, 284 F. App'x 56, 57 (4th Cir. 2008) (holding that a plastic food tray was a dangerous weapon). For these reasons, a variety of both traditional weapons and everyday items have been held to be dangerous weapons when wielded so as to be capable of inflicting serious harm. *See, e.g.*, *United States v. Tolbert*, 668 F.3d 798, 803 (6th Cir. 2012) (plastic water pitcher); *United States v. Serrata,* 425 F.3d 886, 910 (10th Cir. 2005) ("[I]n the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs.") (citations and internal quotation marks omitted); *United States v. Matthews,* 106 F.3d 1092, 1095 (2nd Cir. 1997) (finding that it is settled law in the Second Circuit and other circuits that almost any object can be a dangerous weapon depending on how it is used); *United States v. Johnson,* 324 F.2d 264, 266 (4th Cir. 1963) (noting that "almost any object," including a chair, "which as used or attempted to be used may endanger life or inflict great bodily harm.") (internal citation omitted).

Here, each of the four objects the defendants used—knife, rope, scarf, and 2x4—qualify as dangerous weapons for purposes of the  2H4.1(b)(2)(A) enhancement. The use of the knife, held

against M.B.'s throat by an unindicted coconspirator, was capable of inflicting death or serious bodily harm in the manner it was used. Similarly, the rope used by defendant Rehan Chaudhri in the presence of defendant Aman to tie up M.B. is capable of inflicting death or serious bodily injury. Indeed, M.B.'s daughter's first thought when asked to retrieve the rope at the command of defendant Rehan Chaudhri was that they were going to hang her mother. Tr. 1086.  The same is true of M.B.'s scarf as a scarf—like a rope—is capable of inflicting serious bodily injury when used as a tool to restrain another. Similarly, a 2x4 the size of a tissue box, when used repeatedly to strike a helpless victim as defendant Rehan Chaudhri did, is surely capable of inflicting serious bodily harm.[6] Therefore, the enhancement for use of a dangerous weapon is applicable to all three defendants because each defendant used a dangerous weapon in furtherance of their conspiracy to compel M.B.'s labor on at least one occasion.  Specifically, defendant Aman participated in the knife, rope, and scarf incidents; defendant Rehan Chaudhri participated in the rope and 2x4 incidents,[7] and defendant Nauman Chaudhri participated in the scarf incident.

---

[6] The defendants' focus on whether M.B. actually suffered bodily injury during the attack with the 2x4, or any other attack, is misguided, since the dangerous weapon analysis is focused on the object's capability to inflict serious bodily harm. Having said that, several facts weaken their argument that the 2x4 incident did not happen or that serious bodily injury did not occur. First, when M.B. approached Francisco Vega and Cathy Roarty to use their phones to call her husband Salman Chaudhri, she was wearing traditional dress that covered her body from head to toe, making it impossible for these witnesses to see any otherwise-visible injury. Second, the phone records introduced at trial clearly corroborate M.B.'s story that she actually made the phone calls after defendant Rehan Chaudhri repeatedly struck her with a 2x4; call records show that Salman's phone number received a call from Vega's phone on August 14, 2014, and also another call from the Roarty's phone number a few hours later.

[7] As the Court has already concluded in denying the defendants' motion in limine to exclude acts that occurred outside the conspiracy period, ECF 69, the 2014 to 2016 period was instrumental in covering up and concealing the forced labor that occurred from 2002 to 2014. Through various coercive means detailed above, M.B. was prevented from leaving 2700 London Park Drive by the threats of deportation, never seeing her kids, and leaving her kids in the hands of the defendants. Thus, there is no obstacle to including events from 2014 to 2016 in the relevant conduct for the forced labor conspiracy.

Moreover, each defendant's use of a dangerous weapon is applicable to their codefendants because this case involves a "jointly undertaken criminal activity" where the defendants' uses of dangerous weapons were "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity." *See* U.S.S.G. § 1B1.3(a)(1). As evident by their convictions for conspiracy to commit forced labor, the defendants engaged in "a criminal plan, scheme, endeavor, or enterprise" to compel M.B.'s services. U.S.S.G. § 1B1.3(a)(1)(B) (defining "jointly undertaken criminal activity"). Pursuant to their illegal agreement, the defendants repeatedly used physical violence—including instances where they used dangerous weapons—"in furtherance of that criminal activity," or to create a climate of fear where M.B. reasonably believed she would suffer physical harm if she did not continue to perform labor in the home. U.S.S.G. § 1B1.3(a)(1)(B)(ii). Therefore, each defendant's use of a dangerous weapon is "within the scope" of their "jointly undertaken criminal activity" and "in furtherance of that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B)(i) & (ii).

Additionally, the defendants' constant and repeated use of violence as an integral part of their coercive scheme belies their protestations that their uses of dangerous weapons in furtherance of their criminal activity were not "reasonably foreseeable." Here, all three defendants regularly used physical violence in furtherance of their coercive scheme. Indeed, defendant Aman was the first one to use physical violence against M.B. by slapping her on the face as punishment for being "late" to start her work following a sleepless night caring for a sick infant. Tr. 453. Because of defendant Aman's slap, M.B. knew she had "no say" in the work the defendants instructed her to do in the home and knew she "had to do" whatever they told her. Tr. 458. After that, all three defendants participated in instances of physical abuse against M.B. "[i]f [she hadn't] listened to

them, if [defendant Aman was] angry, [or] . . . if [M.B.] didn't do a chore right." Tr. 441-42; 456. Defendant Aman "hit [M.B.] with so many things and so many times that I can't even tell you." Tr. 455. Defendant Rehan Chaudhri would slap M.B. "[w]henever he would be mad," including one occasion where "he slapped [her] continuously for seven times," and shoved her. Tr. 455-56. Defendant Nauman Chaudhri hit M.B. "[w]henever [she] didn't listen or when Zahida was around," hit her with a plastic lightsaber, and "slapped [her] until the day [she] left the house." Tr. 457-58. Given each defendant's constant use of physical violence as a coercive tool, the fact that such violence would, on occasion, involve the use of other objects was "reasonably foreseeable."

The reasonable foreseeability of each defendant's use of a dangerous weapon is also evidenced by the fact that the defendants observed their coconspirators use objects to assault M.B. Defendant Aman was present for and yelling at M.B. when Bushra Ayaz held a knife to M.B.'s throat. Tr. 506-07, 1083-84. Defendants Nauman Chaudhri and Aman drove after M.B. when she ran away and used her scarf to tie her up before defendants Chaudhri both pulled M.B. out of the car and into the garage. Tr. 544-45. Both defendant Aman and defendant Rehan Chaudhri participated in tying up M.B. and pushing her down the stairs in front of her children to punish her for taking defendant Rehan Chaudhri's phone to call her husband. Tr. 510-11, 966, 1085. Because each defendant saw at least one of their coconspirators use a dangerous weapon against M.B., additional acts of violence involving weapons were "reasonably foreseeable."

## IV. The Defendants' Use of Minors to Commit the Offenses of Conviction Under U.S.S.G. § 3B1.4

The PSR properly applies the 2-level increase outlined in U.S.S.G. § 3B1.4 for the defendants' use and attempted use of M.B.'s minor children "to commit the offense[s]" of forced labor and conspiracy to commit the same. U.S.S.G. § 3B1.4 (imposing a 2-level increase "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense

or assist in avoiding detection of, or apprehension for, the offense"). The commentary to section 3B1.4 defines "[u]sed or attempted to use" as "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting," suggesting that the adjustment applies whenever the defendant "used" a minor in even the broadest sense. U.S.S.G. § 3B1.4, cmt. n.1 (defining "[u]sed or attempted to use"); *see also United States v. Feaster*, 43 F. App'x 628, 632 (4th Cir. 2002) (noting that courts define "use" as referenced in section 3B1.4 broadly, applying the adjustment in cases where the defendant took "some affirmative step" to involve the minor in the offense) (citing *United States v. Suitor*, 253 F.3d 1206, 1210 (10th Cir. 2001) and *United States v. Ramsey*, 237 F.3d 853, 858 (7th Cir. 2001)).

In this case, the defendants[8] argue that they did not use or attempt to use M.B.'s children in the commission of their crimes, with defendant Aman asserting "the minor children played no role in the forced labor" because "there is no evidence that they ever made and/or ordered their mother to perform labor in the home." ECF 270 at 9. However, the defendant need not instruct the minor to compel specific acts of labor for 3B1.4 to apply. *See United States v. Calimlim*, 538 F.3d 706, 718 (7th Cir. 2008) (finding legal error when the district court failed to apply 3B1.4 when the defendants instructed their minor children not to tell anyone about the victim and thereby "used their children to help conceal [the victim] and keep her in bondage all those years"). Therefore, defendant Aman's argument with respect to the children is misplaced.

Moreover, the defendants' argument regarding this adjustment takes too narrow a view of the elements of 1589 and, by extension, fails to appreciate how they used M.B.'s children to facilitate their conspiracy. As this Court has consistently held, the relevant analysis with respect

---

[8] While not addressed in their sentencing memoranda, defendants Rehan and Nauman Chaudhri noted objections to the use of minor adjustment in their PSRs. ECF 265 at 31; ECF 266 at 29.

to section 1589 is not whether the defendants extracted particular tasks through specific threats, but whether the totality of their conduct created a climate of fear that compelled the victim's service. *See* Trans. of Hearing at 13 (3:19-cr-085, Nov. 3, 2020) (finding the testimony of M.B.'s children admissible as part of "a large mosaic of evidence that creates a picture of abuse and a picture of coercion"); ECF 252 at 25-26 (denying the defendants' motion for judgment of acquittal and noting that the instances of violence that "did not immediately relate to the labor [M.B.] provided . . . contributed to the climate of fear created by the defendants to coerce M.B. to remain working in the home"); *see also United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) (upholding defendant's conviction under Section 1584 based on the "climate of fear" the defendant used to compel their victims' work); *United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981) (upholding defendants' conviction under section 1584—the involuntary servitude statute— finding that the record "readily establishes the climate of fear pervading" the agricultural labor camp). Therefore, any conduct where the defendants used M.B.'s children to contribute to the climate of fear they used to compel her labor warrants the application of section 3B1.4.

As explained in greater detail below, each of the defendants prevented M.B. from having a relationship with her children and forbade the children from speaking to their mother. To enforce these rules, each of the defendants: (1) punished the children when they spoke to or expressed a "need" for their mother; (2) told the children that M.B. was dangerous and wanted to hurt them; (3) encouraged F.S.C. to participate in acts of abuse against her mother; (4) threatened to deport M.B. and separate her from her children; and/or (5) engaged in some combination thereof. Through this conduct, the defendants furthered their agreement to build a climate of fear that caused M.B. to reasonably believe that she or her children would suffer physical abuse, humiliation, or isolation if she did not comply with their demands—with respect to domestic labor or otherwise. Moreover,

by separating M.B. from her friends, family in Pakistan, and own children, the defendants completely isolated M.B. as a means of psychological abuse and to foreclose all meaningful avenues of escape. Therefore, by mistreating the children and separating them from their mother, each defendant "used or attempted to use" the children in their forced labor conspiracy.

### A. Defendant Aman's Use of Minors to Commit the Offense

Defendant Aman "used [and] attempted to use" M.B.'s children to compel M.B.'s labor in at least four ways. First, defendant Aman directed, commanded, encouraged, and counseled F.S.C. to engage in physical violence against her mother, causing F.S.C. to slap M.B. on at least one occasion. Tr. 512-14; 1086-88. By so doing, defendant Aman "crushed" and "humiliate[ed]" M.B., causing her to suffer serious mental and psychological harm that contributed to the climate of fear and psychological abuse that compelled her labor. Tr. 512-14.

Second, defendant Aman emotionally separated M.B. from her children. When F.S.C. brought a Mother's Day card home from school, defendant Aman scolded her for listing M.B. on the card first, claiming that M.B. "never was a mother" to her. Tr. 1077-78. Additionally, defendant Aman told M.B.'s children that M.B. "was a thief, she wanted to hurt [them], and that she never cared about [them]" on an almost daily basis. Tr. 1074-75. Defendant Aman also instructed the children that M.B. had been violent with them in the past, describing fabricated instances when M.B. hung K.S.C. out the window and pushed H.M.C. Tr. 1075-76. Because of this conduct, defendant Aman "used" the minor children to separate M.B. from her children, psychologically weakening M.B. and thereby furthering the defendants' forced labor scheme.

Third, defendant Aman punished M.B. and her children whenever the children expressed a "need" for their mother. For example, defendant Aman sent K.S.C. to the laundry room for several hours to punish her for telling defendants Aman and Rehan Chaudhri and her aunt Bushra

Ayaz that she "needed" her mother. Tr. 972-976. This punishment terrified K.S.C., who feared being sent to the laundry room meant she would be "treated like [M.B.] was," or forced to be "completely cut off" from the rest of the family. Tr. 974. Indeed, the thought of defendant Aman and the rest of the family treating her like her mother was so terrifying that the incident caused K.S.C. to suffer from claustrophobia, a condition she continues to experience to this day. Tr. 975-76. To ensure K.S.C.'s release, Bushra—in the presence of defendant Aman—made M.B. slap herself in the face multiple times. By banishing K.S.C. to the laundry room and forcing M.B. to hit herself to guarantee her child's release, defendant Aman and Bushra sent a clear message to M.B. that she or her children would suffer serious harm in the form of emotional or physical abuse if she did not comply with their demands.

Lastly, defendant Aman threatened to deport M.B. whenever she disobeyed the defendants, emphasizing that she would "never see [her] kids again because they are going to stay [in the United States]." Tr. 534. Because of defendant Aman's threats to deport M.B. meant that she would be permanently separated her from her children, M.B. believed she had to "listen to whatever [defendant Aman] said or whatever the family told me to do . . . just be the robot of the house . . . just do what they ask[ed] me to do" lest she lose her children forever. Tr. 437-39. Therefore, defendant Aman "used" M.B.'s children and M.B.'s love for them as a means to compel her labor.

### B. Defendant Rehan and Nauman Chaudhri's Use of Minors to Commit the Offense

Defendants Nauman and Rehan Chaudhri also took affirmative steps to use M.B.'s minor children in the commission of their conspiracy to commit forced labor. Defendant Rehan Chaudhri, along with his mother, instructed K.S.C. to go to the laundry room when she said she needed her mother. Tr. 974. Moreover, defendant Rehan Chaudhri instructed F.S.C. to retrieve the rope he, defendant Aman, and Bushra used to restrain M.B. before pushing her down the stairs in the

presence of her children. Tr. 1084-86. Additionally, he routinely told F.S.C. and K.S.C. that their mother was mentally unstable and had harmed them in the past, causing them to fear their mother and cease all communications with her. Tr. 1074-76. Finally, defendant Rehan Chaudhri regularly threatened to deport M.B. and separate her from her children if she did not comply with the defendants' demands. Tr. 437-39.

Defendant Nauman Chaudhri also used a minor in furtherance of his conspiracy to commit forced labor. Like his codefendants, defendant Nauman Chaudhri regularly threatened to deport M.B., causing her to labor in the house lest she be separated from her children. Tr. 437-39. Moreover, defendant Nauman Chaudhri punished M.B.'s youngest child, H.M.C., by pulling him upstairs and yelling at him after he waved at his mother. Tr. 517-18. Therefore, defendant Nauman Chaudhri's conduct separated M.B. from her children and furthered the defendants' criminal conspiracy to compel her labor.

Based on the above-described conduct, all three defendants "used or attempted to use" M.B.'s minor children to commit their crimes, making the 2-level increase of 3B1.4 applicable.

## V.    Defendant Aman as the Organizer, Leader, Manager, and Supervisor Under U.S.S.G. § 3B1.1(c)

The PSR properly applies a 2-level adjustment to defendant Aman for her role as an "organizer, leader, manager, of supervisor in" the defendants' conspiracy to compel M.B.'s labor. U.S.S.G. § 3B1.1(c). Here, defendant Aman's degree and participation in the planning and organization of the offense, nature of her participation in the offense, exercise of decision-making authority, and degree of control and authority she exercised over others warrants the application of the enhancement. *See* U.S.S.G. § 3B1.1(c), cmt. 4 (outlining "factors the court should consider" with respect to the 3B1.1(c) enhancement).

In this case, defendant Aman led, organized, and managed the criminal conspiracy from its

inception. In 2001, defendant Aman—without participation from her codefendants—organized M.B.'s marriage to Salman, including giving M.B. an engagement ring. Tr. 405-08. Defendant Aman retained her control over the year-long engagement by remaining the primary contact for M.B. and her family, even though it is customary for the bride and groom to speak before the wedding. Tr. 409-10. Defendant Aman further asserted her control at the wedding by threatening to withdraw her son from the marriage after feeling slighted by M.B.'s mother. Tr. 420-22. M.B.'s mother then placed her scarf on defendant Aman's feet—a symbol of complete desperation—causing M.B. to feel she had no choice but to make her marriage a success. Tr. 421-22.

Defendant Aman further asserted her role as the leader and organizer of the family after the wedding. The day after M.B. arrived in the United States, defendant Aman told M.B. "if you want to be happy in your married life, the way to your husband's heart is through me . . . [a]nd if you want him happy, you have to make me happy." Tr. 429. Defendant Aman's instructions echoed what M.B.'s husband told her during their first conversation as husband and wife; that is, "if [my] family, especially [my] Mom, Zahida Aman, is happy . . . [I am] going to put [M.B.] on a pedestal." Tr. 425. Through these comments, defendant Aman and Salman established defendant Aman as the leader of the family and primary person M.B. had to please while living in the home.

Defendant Aman continued to establish herself as the leader of the conspiracy by taking M.B.'s personal items, including her jewelry, list of contact information for her family in Pakistan, and diary shortly after she arrived in the United States. Tr. 431-32, 448, 59-60. The defendant also took M.B.'s immigration paperwork during a family meeting including defendant Aman's husband, Salman, and the codefendants. Tr. 432-34. Therefore, defendant Aman was the leader and organizer of key portions of the defendants' coercive scheme; that is, isolating M.B. from the outside world and foreclosing all meaningful avenues of escape.

Defendant Aman was also the first person to instruct M.B. to perform work in the house and physically abuse her when she failed to comply. Tr. 429-30. Indeed, the first instance of violence occurred when defendant Aman slapped M.B. in the face to punish her for being "late" to start her daily tasks. Tr. 453-55. Additionally, whenever the defendants would verbally attack M.B., it would "start[] from Zahida" before the codefendants joined in, further suggesting that defendant Aman was the leader and organizer of the conspiracy. Tr. 438.

Members of the defendant's household recognized defendant Aman as the leader and organizer of the family and their relationships with M.B.  K.S.C. described defendant Aman as "the lead of the house" who "made the rules," including that she "wasn't supposed to talk to [M.B.]. Tr. 958. Accordingly, "if a fight was going to start, it would go by her." Tr. 958. In a letter to Salman, K.S.C. identified defendant Aman as "the lead of the family" who was not "very merciful." Gov't Ex. 30. F.S.C. also described defendant Aman as the leader of the conspiracy, indicating in a letter to Salman that defendant Aman was the "problem" and "devil" in the house who demanded everyone comply with her "rules" or be "severely punished." Gov't Ex. 31.

Information provided by the defense also establishes the defendant's management and leadership. At trial, defense witness Zulfikar Khan testified that the defendant was in control of her relationship with M.B. and "the whole family." Tr. 1597. Jim Webb's letter, provided by the defendant in preparation for sentencing, indicates the defendant "was the glue that held the family together and helped organize and run the daily planning of meals, household chores and care for her children and grandchildren's needs." ECF 267-1.

Defendant Aman nonetheless asserts that the adjustment should not apply because there is no evidence that she instructed others regarding their relationship with M.B. ECF 270 at 11. This argument fails to acknowledge the defendant's explicit instructions to M.B.'s children regarding

their behavior toward and treatment of their mother. As explained in greater detail above, the defendant explicitly told F.S.C. to slap her mother and prevented the children from speaking to M.B. Tr. 1086-88. Therefore, defendant Aman exercised leadership control over persons she used to further her criminal conduct.

Defendant Aman also argues that 3B1.1(c) does not apply because Salman was responsible for household finances, filled out M.B.'s immigration paperwork, and managed her green card. ECF 270 at 10-11. However, Salman abandoned M.B. early in their marriage, leaving her alone to endure the defendants' mistreatment. Tr. 448-451. Moreover, for the brief period Salman remained in physical proximity to M.B., he deferred to the defendant by telling M.B. to "ask my mom" whenever she made a request. Tr. 444-45. For example, when M.B. asked Salman if she could learn to drive, Salman instructed her to ask his mother, and when defendant Aman refused, Salman informed M.B. that "if she said no, then it's a no." Tr. 468.

Based on this conduct, defendant Aman's degree and participation in the planning and organization of the offense, nature of her participation in the offense, exercise of decision-making authority, and degree of control and authority she exercised over others warrants the application of the 3B1.1 enhancement. *See* U.S.S.G. § 3B1.1(c), cmt. 4

## VI.    Defendant Nauman Chaudhri's Role in the Offense under U.S.S.G. § 3B1.2

Defendant Nauman Chaudhri has not established, by a preponderance of the evidence, that his conduct warrants a 4-level downward adjustment under U.S.S.G. § 3B1.2. *United States v. Gordon*, 895 F.2d 932, 935 (4th Cir. 1990) (noting standard of proof). Indeed, a downward adjustment for minimal participation is only applicable when the defendant is "substantially less culpable," and "had an extremely limited role in [the] criminal enterprise." *United States v. Reavis*, 48 F.3d 763, 769 (4th Cir. 1995) (citing U.S.S.G. § 3B1.2, cmt. n. 1). Therefore, the

"[c]lassification as a minimal participant, for the purposes of downward adjustment, is to be used infrequently." *Reavis*, 48 F.3d at 769 (citing U.S.S.G. § 3B1.2, cmt. n. 2).

Defendant Nauman Chaudrhi argues that he is entitled to a section 3B1.2 adjustment because he was less culpable than his codefendants. ECF 267 at 7-8. However, when considering a minimal role adjustment, courts must "not only compare the defendant's culpability to that of other participants, but also 'measur[e] each participant's individual acts and relative culpability against the elements of the offense of conviction." *Reavis*, 48 F.3d at 769 (quoting *United States v. Daughtrey*, 874 F.2d 213, 219 (4th Cir. 1989)). Therefore, the relevant question is not only whether the defendant was less culpable that his codefendants, but whether he "had an extremely limited role in [the] criminal enterprise" as to warrant the "infrequent" application of 3B1.2. *Reavis*, 48 F.3d at 769 (citing U.S.S.G. § 3B1.2, cmt. n. 1).

Here, defendant Nauman Chaudhri was an active participant in the 12-year conspiracy to compel M.B.'s labor. Indeed, the defendant consistently contributed to the conspiracy by: (1) informing M.B. that her immigration paperwork was incomplete and that she could be deported (Tr. 438); (2) telling her that if she was deported, she could be separated from her children, thereby making her terrified to disobey their commands (Tr. 439-440); (3) calling her a "bitch," "bastard," "whore," and "good-for-nothing" if "a chore, or anything in the house that they have asked [her] to do [was] not done according to their liking" (Tr. 441-42); (4) instructing her to do work in the interior and exterior of the house (Tr. 442, 496-505); (5) telling M.B. to clean debris from the inside of a car with tweezers and a magnifying glass despite the presence of a vacuum cleaner in the house (Tr. 466-67);[9] (6) registering M.B.'s children for school with defendant Rehan Chaudhri

_____

[9] Notably, this testimony belies the defendant's assertion that "[t]here was no specific allegation that Nauman Chaudhri ever requested or required M.B. to do even a single specific chore . . . during the entire time that she lived with the Chaudhri family." ECF 267 at 5.

(Gov't Ex. 17-20); (7) slapping her "until the day [she] left the house" (Tr. 458); (8) dragging her back to the house when she attempted to run away (Tr. 543-46); and (9) punishing M.B.'s youngest child when he dared to speak to his mother (Tr. 517-18).

Based on this conduct, or "nature of the defendant's participation in the commission of the activity," defendant Nauman Chaudhri's involvement in the conspiracy to compel M.B.'s labor was not "minimal." Moreover, because there is no evidence that his codefendants compelled defendant Nauman Chaudhri to engage in this conduct, he had full "discretion," making the adjustment inapplicable. U.S.S.G. § 3B1.2, cmt. 3.C.ii. Additionally, the defendant's consistent contribution to the conspiracy for the entirety of the 12-year-long agreement where he and his family agreed to compel M.B.'s labor, suggests that he "understood the scope and structure of the criminal activity." U.S.S.G. § 3B1.2, cmt. 3.C.i. Finally, the defendant "stood to benefit from the criminal activity" as he—like his codefendants—profited from the free labor M.B. provided in his home. U.S.S.G. § 3B1.2, cmt. 3.C.v.

The defendant nonetheless argues that F.S.C. and K.S.C.'s testimony establishes that he "was a limited participant in the conspiracy," specifically noting that he was kind to his nieces and "at work" for certain acts of violence. ECF 267 at 5. However, the defendant's kindness to F.S.C. and K.S.C. does not warrant the application of a 4-point decrease because it does not negate the 12 years of physical and verbal violence he inflicted on M.B. Indeed, defendant Nauman Chaudhri's illegal treatment of M.B., not his nieces, is the issue before the sentencing court.

Finally, the defendant argues that "the jury was clear as to who among the three defendants it found to be the least culpable" based on his acquittal on Counts Two and Three of the Superseding Indictment. However, the relative culpability of each defendant is not dispositive for purposes of the minimal role decrease. *Reavis*, 48 F.3d at 769 (citing U.S.S.G. § 3B1.2, cmt. n. 1).

Moreover, because the jury convicted the defendant of 18 U.S.C. § 371, his maximum sentence is five years, or 60 months, incarceration. 18 U.S.C. § 371. Absent the statutory maximum, the defendant's applicable guideline range, based on a total offense level of 36 and criminal history category I, would have been 188 to 235 months. Therefore, the offense of conviction already addresses the defendant's culpability relative to his codefendants, making the 4-point reduction of 3B1.2 duplicative.

## VII.    The Defendants' Requests for Below Guideline Sentences Based on Criminal History under U.S.S.G. § 5C1.1

In support of their requests for below guideline sentences, all three defendants put great stock in the fact that they have limited prior records. ECF 273 at 24-25; ECF 268 at 2; ECF 275 at 3-4. Defendant Aman even requests treatment as a first-time offender pursuant to U.S.S.G. § 5C1.1. These are not appropriate bases for departures or variances in this case.

The defendants' limited prior criminal histories are already factored into the calculation of the applicable guideline range. Each defendant is a Criminal History Category I. Thus, each has a lower guideline range than others with more severe prior records who committed the same present offense would have. And, to the extent that they are less likely to recidivate than those defendants with more extensive prior convictions, their guideline range already takes that into account. Defendants offer no basis to believe that a further reduction, below what similarly situated defendants would receive, is justified. Indeed, imposition of a below-guideline sentence on this basis would amount to double-counting defendants' criminal history—once to arrive at the lower applicable guideline range, and a second time to vary from that range. Indeed, the guidelines themselves recognize that a departure of this nature is inappropriate. Section 4A1.3(b), a policy statement addressing downward departures based on criminal history, provides that "[a] departure below the lower limit of the applicable guideline range for Criminal History Category I is

prohibited." *See also Koon v. United States*, 518 U.S. 81, 111 (1996) (finding that the district court abused discretion by basing downward departure in part on assessment that criminal history category I defendants had low likelihood of recidivism); *United States v. Hoover*, 23 F.3d 403, 403 (4th Cir. 1994) (holding that the district court properly denied downward departure motion based on lack of prior record as that fact was already factored into defendant's criminal history category I;  because "[t]here is simply no legal authority to support the assertion that downward departures from the guideline range were warranted for reasons already reflected in the sentencing calculation"). For the same reasons, a variance below that floor would likewise be inappropriate.

Further, not all Criminal History Category I defendants are the same. Some are truly novices at criminal conduct who find themselves before a court for conduct that is out of character for them, and that is itself relatively minor in nature. Then there are the defendants in the present case, for whom Category I does not do justice to the full scope of their lengthy, extensive, and serious criminality.

Here, defendants' crimes were not one-offs. Every day for 12 years these defendants woke up in the morning, looked their family member in the eyes, and egregiously violated her basic human rights. In the process, they regularly committed additional criminal offenses, including frequently assaulting M.B. or directing her children to do so and abducting her and holding her against her will. They mentally and emotionally abused her on a daily basis, deprived her of her liberty, forced her to take care of them and their home without remuneration,[10] deprived her of

---

[10] Defendant Nauman Chaudhri cavalierly asserts that all that M.B. did for the defendants was perform normal domestic chores. ECF 268 at 1 ("the defendants are charged with coercing M.B. to perform the sort of household chores that are commonly done by non-working mothers on behalf of their children and families"). Even if that were the extent, which it was not, the problem with defendant Nauman Chaudhri's assertion is that M.B. did not do so voluntarily. To force her labor, defendants daily intentionally created a climate of fear as described more fully in this and other pleadings and this Court's opinion. *See* Section IV.

basic nutrition and health care, isolated her from both her religious and local community, and stripped her maternal rights from her. They also abused her children to keep M.B. under their control. The defendants' crimes were the result a premeditated plan of extremely serious criminal conduct that they continued for 12 years.[11] This is hardly the conduct of a defendant who typically inhabits Criminal History Category I.

Notwithstanding defendants' self-serving and unsupported assertions that their lack of prior convictions establishes that they will not recidivate, a better indicator of the character of defendants is their utter lack of acceptance of responsibility or expression of remorse. Indeed, they continue to victimize M.B. by refusing to acknowledge even one iota of what they did to her and continue to attack her credibility at trial.

Defendant Aman also argues that the Court should impose a substantial guideline variance pursuant to application note 4 of U.S.S.G. § 5C1.1. That provision merely directs a court to consider a sentence of other than imprisonment for a small category of defendants. Though defendant Aman candidly acknowledges that this provision does not apply in her case, ECF 268 at 1, she nonetheless urges the Court to apply it. She offers no valid basis for the Court to do so.

Section 5C1.1, which is titled "Imposition of a Term of Imprisonment," sets out non-incarceration sentencing options for offenses that fall in zones A and B of the guidelines, the least serious types of offenses. It also sets out options in conjunction with incarceration for offenses that fall in zone C. Because of the significantly serious nature of the defendants' crimes, their offenses fall well within zone D, which is reserved for the worst offenses. Section 5C1.1 provides that for such offenses, "the minimum term shall be satisfied by a sentence of imprisonment." In other

---

[11] Defendant Aman claims that except for the substantial and extremely serious crimes in this case (she does not accurately describe them this way), which went on uninterrupted for 12 years, she "otherwise lived a law-abiding life." ECF 273 at 25.

words, more serious offenses call for more serious punishment, and a sentence that allows a serious offender to avoid incarceration is generally not appropriate.

Application Note 4 does not change this. It directs a court to consider alternatives to incarceration for "nonviolent first-time offenders," but again limits that to offenses that fall in either zone A or B. In other words, even first-time offenders who commit serious offenses should go to jail. And defendant Aman grossly fails to meet the criteria for leniency. In addition, defendant Aman repeatedly used violence[12] against M.B. to force her compliance for 12 years. Defendant Aman nonetheless asks this Court to rewrite § 5C1.1, eliminating the gate-keeping aspects specifically provided by the Sentencing Commission. This would also eliminate the notion that more severe crimes—and defendant Aman's crimes were among the worst—should be punished more severely. Further, the reason she asks the Court to rewrite the guidelines is her assertion that, as a first-time offender, she is less likely to recidivate. As has already been explained, defendant Aman is a first-time offender in name only. Her criminal conduct establishes that she committed atrocious crimes day-after-day for 12 years. Treating her as one would be grossly inappropriate.

## VIII. Defendant Aman's Age and Health

Defendant Aman claims that her age and medical condition support a noncustodial sentence despite the significant range of imprisonment recommended under the guidelines. Neither is a valid basis for avoiding incarceration, and the 18 U.S.C. § 3553(a) factors do not support a noncustodial sentence.

As an initial matter, the guidelines identify several specific offender characteristics that the Court can consider "only to the extent that they have relevance to sentencing." U.S.S.G. Ch. 5, Pt.

---

[12] Application Note 4 defines "a nonviolent first offender" as a person who, inter alia, "did not use violence or credible threats of violence . . . in connection with the offense of conviction."

H at 459. These include a defendant's age and physical condition when those characteristics are present to such an "unusual degree" so as to "distinguish[] the case from the typical case covered by the guidelines." *Id.* However, the introductory commentary cautions against giving such factors, which pertain to "the history and characteristics of defendant," 18 U.S.C. §3553(a)(2), "excessive weight," so as to avoid creating "unwarranted sentencing disparities." *Id.* at 458. Although the Court can consider specific offender characteristics in determining whether to impose a non-guideline sentence and what type of sentence to impose, the Commission has cautioned:

> Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range but for other reasons, such as in determining the sentence within the applicable range, the type of sentence (*e.g.*, probation or imprisonment) within the sentencing options available for the applicable Zone on the Sentencing Table, and various other aspects of an appropriate sentence.

*Id.* Indeed, to avoid unwarranted disparities, "the guideline range, which reflects defendant's criminal conduct and defendant's criminal history, should continue to be 'the starting point and the initial benchmark.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

The Bureau of Prisons (BOP) can provide the care defendant Aman requires. Defendant Aman "suffers from several health issues, including type 2 diabetes, vitamin D deficiency, mixed hyperlipidemia,[13] hypocalcemia,[14] hypokalemia,[15] essential hypertension, and atrial fibrillation.[16]

---

[13] Mixed hyperlipidemia "is an inherited condition in which levels of certain lipids (fats) in the blood are higher than they should be." https://www.healthline.com/health/cholesterol/mixed-hyperlipidemia-symptoms.

[14] "Hypocalcemia is a treatable condition that happens when the levels of calcium in your blood are too low." https://my.clevelandclinic.org/health/diseases/23143-hypocalcemia.

[15] "Low potassium (hypokalemia) refers to a lower than normal potassium level in your bloodstream." https://www.mayoclinic.org/symptoms/low-potassium/basics/definition/sym-20050632/

[16] "Atrial fibrillation, often called AFib or AF, is the most common type of treated heart arrhythmia. An arrhythmia is when the heart beats too slowly, too fast, or in an irregular way." https://www.cdc.gov/heartdisease/atrial_fibrillation.htm.

She is prescribed numerous medications and has been encouraged to follow a heart healthy, diabetic controlled diet." ECF 265 at 23. She also claims to be obese, and defendant Nauman reported "that she suffers from congestive heart failure."[17] ECF 273 at 19. Because of these conditions, defendant Aman claims that BOP is unable to provide her with adequate medical care and requests an enormous downward variance to home confinement.

Her assertions are contradicted by the medical opinion of Maria F. Marrero, MD, BOP's Regional Medical Director for the Mid-Atlantic Region, who is confident that BOP can provide the requisite care. *See* Exhibit B.[18] As Dr. Marrero explains, when inmates are committed to BOP custody, the Office of Medical Designations reviews their medical history to determine which of BOP's facilities is best able to meet their needs. Exhibit B at 2. And "every BOP facility, regardless of care level, has a Health Services Department, typically staffed with a physician(s) and several mid-level providers, such as physicians assistants and nurse practitioners, along with technical and administrative staff." *Id.* In addition to the care facilities within BOP institutions, "each BOP institution also contracts with medical centers in the local vicinity to provide specialized medical treatment." *Id.* These "community facilities supplement BOP resources and provide inmates with specialists and diagnostic tools," as well as access to "a wide range of trained medical and surgical specialists" should a medical emergency or need for surgical procedure arise. *Id.* at 2-3.

All incoming inmates are "thoroughly screened by medical staff for physical and mental health conditions, and are monitored thereafter through follow-up appointments and Chronic Care Clinics, as necessary." Exhibit B at 3. BOP implements "medical plan[s] of action" for inmates

---

[17] The United States notes the oddity of a codefendant claiming defendant Aman suffers from a medical condition that she herself does not claim to have, per the wording of the PSR.

[18] Dr. Marrero's letter is complete but pending signature. The United States will file the letter as soon as it is received.

based on a "thorough and timely history and physical exam" through which BOP ascertains inmates' mental health and medical status. *Id.* Contrary to defendant Aman's arguments and assumptions, BOP can and does provide individualized care tailored to each inmate's medical and mental health needs.

Further, although certainly serious to her, defendant's health issues pale in comparison to the complexity and level of care required to treat more medically complex conditions like cancer and organ transplants, which BOP regularly does. Defendant Aman's claims that BOP is incapable of treating her common health concerns are therefore without merit.

To support their assumptions to the contrary, defendant Aman relies on outdated Office of Inspector General reports describing shortcomings identified within BOP's care of older inmates nearly ten years ago. ECF 273 at 20-23. Without investigating and accounting for any intervening developments, defendant Aman maintains that these prior shortcomings conclusively demonstrate that any recent assessment of BOP's ability to care for her is simply "aspirational." *Id.* at 21. The 2016 OIG report often focuses not on insufficient or inadequate care, but on programs, policies, and procedures governing such care. That BOP may have lacked consistent nationwide procedures in 2016 for providing elder care says little to nothing about the quality of care in 2016 or 2023.

The 2020 OIG report is similar in its recommendations and similarly refuted. A 2018 OIG report found shortcomings in BOP's provision of services related to trauma treatment programming, pregnancy programming, and feminine hygiene, because in 2018, BOP was still developing processes to enhance the provision of female-specific services.[19] Here, defendant

---

[19] Office of the Inspector General, *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population*, September 2018, page i, https://www.oversight.gov/sites/default/files/oig-reports/e1805.pdf.

Aman does not require trauma treatment or pregnancy programming, making the concerns raised in this report inapplicable. Similarly, a 2020 OIG report criticized a particular BOP facility in New York City for reduced medical services during a partial 7-day power outage caused by an electrical fire.[20] But, defendant Aman simply asserts that these issues are somehow general to BOP and therefore applicable to any facility to which she may be assigned.

Defendant Aman also cites a Forbes article as evidence that BOP "has failed to correct its inadequacies in treating elderly and health-compromised patients. . . . " ECF 273 at 21-22. The article cites BOP's failure to implement a new system of providing care to which it aspired in 2014—before the COVID-19 pandemic—and an Office of Inspector General Report of the care provided at three facilities—FCC Butner, FMC Devens, and FCI Ray Brook—between 2012 and 2014, which generally found that BOP lacked processes and systems to effectively monitor the care provided at those facilities. The author then reports anecdotes from unnamed BOP employees about particular instances of understaffing in unidentified BOP facilities that would prevent BOP from implementing the proposed system of care. This anecdotal evidence from unspecified facilities does not demonstrate that defendant will not receive adequate medical care if committed to BOP custody, and further ignores that the civilian health care population through which she would otherwise seek care is also under a medical personnel staffing emergency.[21]

Defendant Aman also claims that her advanced age and health conditions makes her less

---

[20] Office of the Inspector General. *Top Management and Performance Challenges Facing the Bureau of Prisons*. Office of the Inspector General, 16 Oct. 2020, p. 19, https://oig.justice.gov/sites/default/files/reports/2020.pdf (citing Office of the Inspector General. *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates,* September 2019, p. i, https://www.oversight.gov/sites/default/files/oig-reports/e1904.pdf.

[21] *See, e.g.,* Andrew Jacobs, *'Nursing Is in Crisis': Staff Shortages Put Patients at Risk*, New York Times (Aug. 21, 2021), https://www.nytimes.com/2021/08/21/health/covid-nursing-shortage-delta.html.

likely to recidivate. Whatever the general relationship is between age and health and recidivism, it does not appear to be true for the defendant, who committed the crimes at issue in her 60s and into her mid-70s. Moreover, as stated above, the greatest indicator of the defendants' likelihood of recidivism is their complete failure to admit responsibility or express remorse.

### IX.    Defendants Aman and Nauman Chaudhri's Requests for Variance Based on Family Circumstances

Despite guidelines that call for a substantial sentence of imprisonment, defendant Aman seeks a variance to probation, claiming that she is needed to care for her husband, Aman Ullah Chaudhri. ECF 273 at 23-24. Defendant Nauman Chaudhri seeks a downward departure to probation or home confinement for the same reason.[22] ECF 269. While the United States does not doubt that Mr. Chaudhri is in ill health, it has received no records that identify his specific health issues,[23] his prognosis,[24] or the level of care he requires. Defendants have also failed to inform the Court what necessary assistance each one provides for Mr. Chaudhri and how that cannot be replicated by others. Such information is necessary for the Court to consider this argument. *See*

---

[22] Defendant Nauman Chaudhri also asserts that he is needed to care for his codefendant mother.

[23] Defendant Aman asserts that Mr. Chaudhri is dying. He has leukemia and dementia and has recently suffered a stroke. ECF 273 at 23-24. Defendant Nauman Chaudhri says that his father has advance-stage cancer, dementia, and high blood pressure. He also reports that his father has had a stroke. ECF 269 at 3. There are no records that substantiate this information.

[24] Defendant Aman has represented that her husband is receiving "comfort care," ECF 273 at 23, though she provides no details of this. If this care is hospice care, then that means that it is anticipated that Mr. Chaudhri has six months or less left to live. Hospice Care: Comforting the Terminally Ill, Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/end-of-life/in-depth/hospice-care/art-20048050#:~:text=Hospice%20care%20is%20for%20people,psychological%2C%20social%20and%20spiritual%20needs.

While that is tragic, it would mean that the need for any care for Mr. Chaudhri is very short-term, and, even if one of the present defendants is needed to provide that care for him, that defendant could start a prison sentence in the near future. Mr. Chaudhri's unfortunate circumstances would not be any basis for consideration of a sentence that would be a substantial departure from the applicable guidelines and that would not justly punish defendants for their horrific criminal conduct in this case.

*United States v. Arhuleta*, 128 F.3d 1446, 1450 (10th Cir. 1997) (overturning downward variance for defendant who asserted he was needed to care for his ailing mother because the "record is scarce on the details of the care she requires"). Further, a sentence of probation or home confinement for these defendants based on the health conditions of Mr. Chaudhri is inappropriate.

Unfortunately, a defendant's decision to engage in criminal conduct may have deleterious collateral consequences for his or her family. Unless those consequences are dire and there is no other way to ameliorate them, however, they do not warrant leniency. *Koon v. United States*, 518 U.S. 81, 82 (1996) (where a factor is discouraged by the guidelines, a court should depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present"); *United States v. Wilson*, 114 F.3d 428, 434 (4th Cir. 1997) ("Generally, a sentencing court may depart downward on this basis only if it finds that the defendant is essentially irreplaceable"); *United States v. Maddox*, 48 F.3d 791, 799 (4th Cir. 1995) (downward departure for family responsibilities "are permitted only in rare cases"); *see also Elliott v. United States*, 332 F.3d 753, 768-69 (4th Cir. 2003) (reversing downward departure for defendant who was primary caregiver for husband who suffered "severe periods of confusion and memory loss" as a result of cancer treatment, had suffered five-way bypass surgery, and had diabetes); *United States v. Brand*, 907 F.2d 31, 33 (4th Cir. 1990) (vacating downward departure of defendant who was sole caretaker of two young children who would have to live with "blood strangers" if defendant incarcerated as circumstances not extraordinary); *United States v. Goff*, 20 F.3d 918, 921 (8th Cir. 1994) (vacating downward departure for defendant who supported three young sons and whose wife was unable to care for them because of depression disorder and panic attacks: "[t]hough we do not underestimate the hardship that Goff's incarceration will cause his family, his family responsibilities are simply not outside the heartland of cases that the Sentencing

Guidelines has considered").

Accordingly, a defendant's family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted."[25] U.S.S.G. § 5H1.6. Among the factors the Court must consider in deciding whether to depart based on family responsibilities is "the seriousness of the offense." Application Note 1(A)(i). Further, the Court must also consider whether:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family;
>
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant;
>
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family; [and]
>
> (iv) the departure effectively will address the loss of caretaking or financial support.

Application Note 1(B).

The concern of financial support is not a factor in this case as none of the defendants are contributing financially to the family.

The seriousness of defendants' crimes weighs extremely heavily against a departure or variance. For more than 12 years, these defendants daily, knowingly, and intentionally subjected M.B. to imprisonment far worse than any experience these defendants will face in the Federal Bureau of Prisons. By design they dehumanized her; psychologically abused her; beat her; isolated her from friends, family, and any meaningful human interaction; starved her to the point that she

---

[25] Defendant Aman seems to recognize that a downward departure on this ground would not be appropriate. ECF 273 at 24. While abandoning that approach she simply suggests the Court should simply accomplish the same result through a variance. But defendant offers nothing to explain why a variance on this discouraged ground would be appropriate. The same concerns that militate against a departure apply equally to a variance.

became unrecognizable; ignored her mental and physical health needs; forced her to work long, strenuous hours, often just to make her work; and turned her children against her and stripped her of her maternal involvement in their lives, all to gain and maintain absolute control of her. It would be the height of injustice for these defendants to escape their own imprisonment, at a humane facility, as just punishment for their extensive, horrific, and inhumane criminal conduct. The health needs of Mr. Chaudhri do not change that.

As already mentioned, defendants have not provided sufficient information for the Court to even consider this issue. But, even based on what is known, the motions are without merit. There is no basis to believe that any of these defendants, let alone more than one, is needed to provide care for Mr. Chaudhri. As defendant Aman admits, her daughter, Bushra, already participates in providing care for Mr. Chaudhri. Bushra is presently living across the street from his residence. While she apparently travels on occasion to Pakistan, there is also grossly little information about the frequency, duration, or need of this. In addition, while Salman Chaudhri lives in California,[26] he regularly traveled to Richmond approximately every month for ten or so days. There is no reason he could not continue to do so to handle caretaking duties for however much longer they are required, when Bushra is unavailable.

Further, notwithstanding defendant Nauman Chaudhri's assertions to the contrary, the family does have sufficient resources to place Mr. Chaudhri in a facility that could provide more extensive, full-time care. Defendant Nauman Chaudhri provides that the family has monthly expenses of approximately $10,753.50. ECF 265 at 20. Most of that is provided by Salman, who will continue to be available to provide these funds. And, as defendants Aman and Nauman and

---

[26] Defendant Nauman Chaudhri asserts that moving Mr. Chaudhri to California "is likely not practical." ECF 269 at 4. He offers no basis for this opinion.

Rehan Chaudhri will be incarcerated, the funds that were previously used for their upkeep may instead be used for the care of Mr. Chaudhri. Further, the family owns two residences, 2700 and 2701 London Park Drive. Defendant Nauman Chaudhri owns the latter. With the defendants incarcerated, at least one house can be sold. Defendant Nauman Chaudhri's residence, at 2701 London Park Drive, is valued at $331,700 and has a mortgage of $261,481. ECF 265 at 20. In addition to providing a large sum of money, sale of this residence will reduce expenses associated with its ownership, including mortgage payments and utilities.[27] Thus, more of the amount provided by Salman will be available for the care of Mr. Chaudhri, for whatever time more that will be needed.

X.    **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court sentence each defendant to a guideline sentence as calculated by the PSRs.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:_____/s/_____
     Shea Matthew Gibbons
     Virginia Bar No. 83916
     Stephen Miller
     Virginia Bar No. 23704
     Assistant United States Attorneys
     919 East Main Street, Suite 1900
     Richmond, VA 23219
     Phone: (804) 819-5400
     Telefax: (804) 771-2316
     Shea.Gibbons@usdoj.gov
     Stephen.Miller@usdoj.gov

---

[27] The other residence could be sold as well, with Bushra moving to a smaller, less expensive place. Defendant Nauman Chaudhri also has a Mercedes valued at $21,700, which he could sell. ECF 269 at 20.

KRISTIN CLARK
ASSISTANT ATTORNEY GENERAL

By:_____/s/_____

    Leah Branch
    Trial Attorney
    950 Pennsylvania Avenue
    NW Washington, DC 20004
    Phone: (202) 598-1459
    leah.branch@usdoj.gov